**STATE ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

**v.**

**Robert L. JOHNSTON, Respondent.**

**Nos. SCBD 3800, OBAD 1041.**

Supreme Court of Oklahoma.

June 29, 1993.

---

**15.** *See Mailath, supra* note 12 at 805; *Willner, supra* note 12 at 373 U.S. at 103–104, 83 S.Ct. at 1180–1181.

OPALA, Justice.

In this disciplinary proceeding against a lawyer, the issues to be decided are: (1) Is the record, consisting of the stipulated facts and a transcript of proceedings, sufficient for a meaningful *de novo* consideration of the complaint's disposition? and (2) Is a four-month suspension an appropriate disciplinary sanction to be imposed for respondent's professional misconduct? We answer both questions in the affirmative.

The Oklahoma Bar Association [Bar] charged Robert L. Johnston [Johnston or respondent], a licensed lawyer, with one count of professional misconduct. The Bar and Johnston then entered into a stipulation of facts and agreed conclusions of law with a joint recommendation for a four-month suspension to be imposed as professional discipline for that misconduct. A panel of the Professional Responsibility Tribunal [PRT] adopted the parties' offer for an agreed disposition.

John E. Douglas, Asst. Gen. Counsel, Oklahoma Bar Ass'n, Oklahoma City, for complainant.

John W. Coyle, III, Oklahoma City, for respondent.

## STIPULATION OF FACTS

In November 1990, respondent entered into a contract with Mr. and Mrs. T ... [adoptive parents], Texas residents, to represent them in an adoption proceeding. Their agreement is contained in a letter from respondent to the couple.[1] They gave

---

1. The text of the letter agreement is:
 "December 21, 1990
 .... and.... T ...
 \* \* \* \* \* \*
 Re: Adoption
 Dear Mr. and Mrs. T ...:
 I apologize for not getting back with you sooner, but several trials have kept me very busy. I acknowledge receipt of $10,000.00 as and for fees deposited with me by your personal check for purposes of assuring the Adoption of a healthy baby. You have agreed to provide these funds so that I may be able to pay all expenses for the pregnancy and birth, as well as all fees and expenses for my services with regard to the Adoption. I will pay all bills on an 'as invoiced' basis for the pregnancy. If the child is not a 'healthy baby,' to your satisfaction, you will be refunded the remaining funds. I have been advised by the Dr. caring for the mother of the child that the mother has tested negative for HIV and com-

municable diseases. Also, all blood work, history and ultra sound is complete and the mother is fine and the Dr. foresees no health or delivery problems.
 I am enclosing a copy of the Petition for Adoption and Appearance and Consent to Adoption previously executed. I am anticipating the child will be born in late January, 1991 and because we are completing this 'without investigation' I will have to file the Petition after the birth, this will not alter your scheduled pick up of the child after birth. It simply means that the time for running of the publication will be extended 45 days. I would greatly appreciate a copy of the home study which you have from a previous birth as soon as possible.
 If you have any further questions, please feel free to contact me.
 Merry Christmas
 Virtually yours,
 /s/ Robert L. Johnston"

respondent $10,000, out of which he was to pay (a) all medical bills relating to the pregnancy and (b) his legal fees for handling the adoption.

The biological parents, residents of Oklahoma County, had agreed to place their then-unborn child for adoption with the Ts, who were to pay the medical bills. The baby was born on January 22, 1991 in Oklahoma City. The following day, respondent's secretary carried the child from the hospital and delivered it to the Ts at the Will Rogers World Airport in Oklahoma City.

On November 23, 1990, respondent deposited the adoptive parents' $10,000 check in his trust account. Of that amount, he paid $2,120.00 to the attending physician [physician] for the mother's medical care. Respondent stipulated that he "paid himself the balance [of the funds on hand] as attorney's fees."[2] The physician was originally scheduled to deliver the child at his clinic, but due to unforeseen complications, the child was born at home. The mother and child were then transferred by AM-CARE to South Community Hospital. This unexpected medical treatment substantially increased the medical care costs to $6,055.58.

On October 24, 1991, the Ts' Texas counsel filed a grievance with the Bar against respondent because he had failed to take the necessary steps to finalize the adoption proceedings. In fact, he had never filed a petition for adoption on behalf of the Ts. The Bar brought its complaint on February 25, 1992. On March 18, 1992, the same day that respondent filed an answer to the Bar complaint, he paid the medical care providers. Two other bills were paid on June 11, 1992. On the date of the hearing, July 9, 1992, the Bar's counsel reported that respondent had given him a check ($3,944.42) for the balance of the funds not used for the medical care or related incidental expenses. *He did not retain any of the funds for his attorney's fee.*

Respondent failed diligently or competently to work on this matter or to communicate appropriately with his clients. On June 12, 1991, he wrote the biological parents that he was attempting to work out an appropriate settlement with each care giver and that he had notified each one he was assuming responsibility for the debt.[3] Despite his representations, respondent failed timely to settle or pay the debts related to the baby's birth. *According to the stipulation, the funds allocated to pay medical care did not remain in respondent's trust account during the period between the time he received them and the time they were paid.*

The State of Oklahoma, where the biological parents reside and the baby was born, and the State of Texas, where the adoptive parents reside, are both parties to the Interstate Compact on the Placement of Children.[4] Respondent was required by the laws and administrative regulations of both states to comply with certain conditions relating to the adoption before he sent the child to Texas. He failed to meet these requirements, such as obtaining the approval of the interstate compact administrator in Oklahoma before allowing the baby to be taken out of state.

On January 23, 1991, when respondent appeared with the biological parents to take their consent to the adoption of the child, he told the court that the adoptive parents were in the process of moving to Oklahoma and would be domiciled in Oklahoma County. Though this statement was admittedly false, the signed consent form approved by the judge indicates that both the biological parents and the judge were

2. Agreed Stipulations of Fact, Conclusions of Law, and Agreed Recommendation of Discipline, No. 11, p. 4.

3. Respondent's letter states in part:
"I have been in contact with each and every care giver in this matter and am attempting to work out a just and appropriate settlement in this regard. I have advised each and every care giver that all statements should be addressed directly to me in that I have assumed responsibility, as per our agreement, for each and every debt."

4. Interstate Compact On The Placement Of Children, 10 O.S.1981 §§ 571–576.

aware of the child's impending removal from Oklahoma.[5]

## AGREED CONCLUSIONS OF LAW

The parties' stipulation concedes that Johnston's misconduct violates the mandatory provisions of Rules 1.1,[6] 1.3,[7] 1.4,[8] 1.15,[9] and 8.4,[10] Oklahoma Rules of Professional Conduct, and Rule 1.4,[11] Rules Governing Disciplinary Proceedings, and constitutes grounds for professional discipline.

## CONCESSION AS TO AVAILABLE MITIGATION

The parties submit that (a) respondent paid all bills in the total amount of $6,055.58, (b) respondent has returned all of the residual funds in the amount of $3,944.12 (at the beginning of the hearing he gave the Bar counsel a check in that amount), (c) they expect the adoption will be completed by new counsel, and (d) respondent has not previously been disciplined.

## THE PARTIES' RECOMMENDATION FOR DISCIPLINE

The parties recommend that respondent (a) be suspended from the practice of law for a four-month period and (b) pay the costs incurred in this proceeding.

5. A standard questionnaire is used to elicit certain information from the biological parents of the child. One of the questions on the form states:

"14. Is this child to be sent out of Oklahoma to another State, or brought into Oklahoma from another State, for purpose of adoption? A. *Yes* (Explain, if answer is Yes) _____"

6. The terms of Rule 1.1, Oklahoma Rules of Professional Conduct, 5 O.S.Supp.1988, Ch. 1, App. 3–A, are:

"A lawyer *shall* provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." (Emphasis added.)

7. The terms of Rule 1.3, Oklahoma Rules of Professional Conduct, 5 O.S.Supp.1988, Ch. 1, App. 3–A, are:

"A lawyer shall act with reasonable diligence and promptness in representing a client."

8. The terms of Rule 1.4, Oklahoma Rules of Professional Conduct, 5 O.S.Supp.1988, Ch. 1, App. 3–A, are:

"(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

9. The pertinent terms of Rule 1.15, Oklahoma Rules of Professional Conduct, 5 O.S.Supp.1988, Ch. 1, App. 3–A, are:

"(a) A lawyer *shall* hold property of clients or third persons that is in a lawyer's possession in connection with a representation *separate from the lawyer's own property.* Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated. . . .
(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.
(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. *If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved."* (Emphasis added).

10. The pertinent terms of Rule 8.4, Oklahoma Rules of Professional Conduct, 5 O.S.Supp.1988, Ch. 1, App. 3–A, are:

"It is professional misconduct for a lawyer to:

\* \* \*

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;"

11. The pertinent terms of Rule 1.4, Rules Governing Disciplinary Proceedings, 5 O.S.1981, Ch. 1, App. 1–A, are:

" \* \* \* (b) *Where money or other property has been entrusted to any attorney for a specific purpose, he must apply it to that purpose.* He may not avail himself of a counterclaim or setoff for fees against any money or other property of his client coming into his hands for such specific purpose, and a refusal to account for and *deliver over such money or property upon demand shall be deemed a conversion.* . . .

I

## THE RECORD BEFORE THE COURT IS COMPLETE FOR A *DE NOVO* CONSIDERATION OF ALL FACTS RELEVANT TO THIS PROCEEDING

 The Oklahoma Supreme Court has exclusive original jurisdiction over Bar disciplinary proceedings.[12] The court's review is conducted by *de novo* consideration of the prosecution that is brought before us.[13] Neither the trial authority's findings nor its assessments with respect to the weight or credibility of the evidence can bind this court.[14] In a *de novo* consideration, in which the court exercises its constitutionally invested, nondelegable power to regulate both the practice of law and the

legal practitioners,[15] a full-scale exploration of all relevant facts is mandatory.[16]

 The court's task cannot be discharged unless the PRT panel submits a complete record of proceedings for a *de novo* examination of all material issues.[17] Our responsibility is to ensure that the record is sufficient for a thorough inquiry into essential facts and for crafting the appropriate discipline [18] that would avoid the vice of visiting disparate treatment on the respondent-lawyer.[19]

 Johnston has admitted, and the record sufficiently supports, the allegations of professional misconduct in Count 1. We hold the record is adequate for our *de novo* consideration of respondent's offending past conduct.

(c) *Theft by conversion or otherwise* of the funds of a client shall, if proved, result in disbarment." (Emphasis added).

**12.** *State ex rel. Okl. Bar Ass'n v. Donnelly,* Okl., 848 P.2d 543, 545 (1992); *State ex rel. Okl. Bar Ass'n v. Raskin,* Okl., 642 P.2d 262, 265 (1982); *In re Integration of State Bar of Oklahoma,* 185 Okl. 505, 95 P.2d 113, 114 (1939).

**13.** *State ex rel. Okl. Bar Ass'n v. Lloyd,* Okl., 787 P.2d 855, 858 (1990); *Okl. Bar Ass'n v. Stubblefield,* Okl., 766 P.2d 979, 982 (1988); *State ex rel. Okl. Bar Ass'n v. Cantrell,* Okl., 734 P.2d 1292, 1293 (1987); *Raskin, supra* note 12 at 265–266. Because this court's cognizance of disciplinary proceedings cannot be shared with any other institution, every aspect of the Bar's adjudicative process must be supervised by our *de novo* consideration. This attribute of nondelegable jurisdiction serves to distinguish the conduct of bar disciplinary functions from trial *de novo*—a retrial in a different court—or even from *de novo* appellate review on the record, which stands for an independent, non-deferential examination of another tribunal's record.

**14.** *Raskin, supra* note 12 at 265. The pertinent terms of Rule 6.15, Rules Governing Disciplinary Proceedings, 5 O.S.1981, Ch. 1, App. 1–A, are:

"(a) *The Supreme Court may approve the Trial Panel's findings of fact or make its own independent findings, impose discipline, dismiss the proceedings or take such other action as it deems appropriate.*" (Emphasis added).

**15.** *Raskin, supra,* note 12 at 266; *Tweedy v. Okl. Bar Ass'n,* Okl., 624 P.2d 1049, 1052 (1981).

**16.** *State ex rel. Okl. Bar Ass'n v. Dugger,* Okl., 385 P.2d 486 (syllabus) (1963).

**17.** The pertinent terms of Rule 6.13, Rules Governing Disciplinary Proceedings, 5 O.S.1981, Ch. 1, App. 1–A, are:

"... [T]he trial panel shall file with the Clerk of the Supreme Court a written report which shall contain the Trial Panel's *findings of fact on all pertinent issues and conclusions of law (including a recommendation as to discipline ...) * * *.*" (Emphasis added.)

**18.** A complete record is well-nigh necessary for review of a bar disciplinary proceeding. The material to be considered is never to be deemed settled beyond our ability to expand it. The record always remains within this court's plenary power to order its supplementation. *State ex rel. Okl. Bar Ass'n v. Moss,* Okl., 794 P.2d 403, 404 (1990); *State ex rel. Okl. Bar Ass'n v. Samara,* Okl., 683 P.2d 979, 983 (1984); *State ex rel. Okl. Bar Ass'n v. Warzyn,* Okl., 624 P.2d 1068, 1071 (1981). *See also State ex rel. Okl. Bar Ass'n v. Armstrong,* Okl., 791 P.2d 815, 816 (1990), which teaches that an interim suspension of an attorney cannot be made on an incomplete record. The same problem confronted this court in State ex rel. Okl. Bar Ass'n v. Lloyd, SCBD No. 3145 received November 17, 1987 [*Lloyd I*]. There, we declined to accept the trial panel's recommendation and returned the case for a full evidentiary hearing before the panel whence it came. For an explanation, see *Lloyd II, supra* note 13 at 856.

**19.** *State ex rel. Okl. Bar Ass'n v. Perceful,* Okl., 796 P.2d 627, 630 (1990).

## II

### RESPONDENT'S FALSE STATEMENT TO THE TRIAL JUDGE

#### A.

*Rule 8.4(c)—Misrepresentation*

 The OBA charged Johnston with making a misrepresentation to the trial judge in violation of Rule 8.4(c). That rule, which generally targets fraudulent conduct,[20] is directed to a lawyer's "dishonesty, fraud, deceit or misrepresentation."[21] A misrepresentation must be shown by clear and convincing evidence that the declarant had an underlying motive (i.e., bad or evil intent) for making the statement.[22] The record is devoid of any indication that Johnston had an improper motive.

Johnston admits that (a) he told the trial judge the adoptive parents were planning to move to Oklahoma from their residence in Texas and (b) the statement is not true. The PRT found the statement would have served no purpose in the judge's evaluation of the case. Nothing in the record indicates to us that it would have been advantageous for Johnston to misinform the

court.[23] Without establishing an improper motive for Johnston's statement, the Bar has not met its burden of proving that a "misrepresentation" was made.

#### B.

*Rule 3.3—False Statement To A Tribunal*

 While no "bad or evil intent" is shown by the record, Johnston is not relieved of professional responsibility for his false statement to the court. Any charge of "misrepresentation" to a judge or tribunal also carries with it an included or implied count of making a "false statement" in violation of Rule 3.3(a)(1).[24] The converse is not true.

 A "false statement" to a tribunal, as distinguished from a "misrepresentation," requires no proof of "bad or evil intent,"[25] nor must it be material.[26] It matters not that the Bar failed to plead a specific Rule 3.3 violation. The Bar need only plead sufficient facts that will put the accused attorney on notice of the charges and give him an opportunity to respond to the facts alleged.[27]

20. *State ex rel. Okl. Bar Ass'n v. Todd*, Okl., 833 P.2d 260, 263 (1992); *Okl. Bar Ass'n v. McMillian*, Okl., 770 P.2d 892, 899 (1989).

21. For the pertinent text of Rule 8.4, see *supra* note 10. Rule 8.4(c) is substantially the same as its predecessor, DR 1–102(A)(4), Code of Professional Responsibility, 5 O.S.1981, Ch. 1, App. 3, which provided: "(A) A lawyer shall not: * * * (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." *Todd, supra* note 20 at 262. *McMillian, supra* note 20, teaches that because DR 1–102(A)(4) is geared toward fraudulent conduct, bad or evil intent or its equivalent must be shown by clear and convincing evidence in order to make out a violation of the rule.

22. *Todd, supra* note 20, 833 P.2d at 263; *McMillian, supra* note 20 at 899.

23. There appears to have been no specific advantage Johnston might have hoped to gain by informing the court that the adoptive parents would be moving to Oklahoma and would be domiciled in Oklahoma County. No motive for the misstatement is divinable. It is possible that Johnston merely perceived that he or his client would be benefited as a result of the misrepresentation, when in fact, no advantage could have been gained.

24. The terms of Rule 3.3(a)(1), Oklahoma Rules of Professional Conduct, 5 O.S.Supp.1988, Ch. 1, App. 3–A, are:

"(a) A lawyer shall not knowingly:
(1) make a false statement of fact or law to a tribunal;"
In *Todd, supra* note 20 at 262 n. 2, we declined to entertain a Rule 3.3 violation of making false statements to a tribunal because we already found a violation of the then-effective Code of Professional Responsibility, 5 O.S.1981, Ch. 1, App. 3, DR 1–102(A)(4), which is virtually identical to Rule 8.4(c), *supra* note 10.

25. *McMillian, supra* note 20 at 899. *McMillian* construed the then effective DR–7–102(A)(5), Code of Professional Responsibility, 5 O.S.1981, Ch. 1, App. 3, which is virtually identical to the now effective Rule 3.3(a)(1), *supra* note 24.

26. *See* Rule 3.3(a)(1), *supra* note 24, Oklahoma Modification, which indicates that the word "material" was intentionally excluded from Rule 3.3(a)(1).

27. *State ex rel. Okl. Bar Ass'n v. Miskovsky*, Okl., 804 P.2d 434, 440 (1990); *Moss, supra* note 18 at 407.

 On *de novo* consideration of the record, we conclude that the alleged facts sufficiently put Johnston on notice and that he had a fair opportunity to respond to them. He does not deny making the false statement to the court and having actual knowledge [28] that his clients did not intend to move to Oklahoma. Even though Johnston claims he might have mistakenly confused the Ts' case with another one, this does not exonerate him of making a false statement. The fact that the judge in this instance did not seem to rely on the statement is also irrelevant. Under Rule 3.3(a)(1), any incorrect statement of law or fact made to a tribunal by a lawyer having actual knowledge of its falsity, no matter how insignificant, is grounds for discipline. The word "material" was intentionally omitted from Rule 3.3.[29] Johnston's false statement, albeit on a non-material point, is a violation that warrants disciplinary sanction.

**28.** 5 O.S.1991 Ch. 1, App. 3–A (Terminology) which defines "knowingly" as denoting "actual knowledge of the fact in question." It also states that a "person's knowledge may be inferred from circumstances."

**29.** See *supra* note 24.

**30.** For the pertinent text of Rule 1.15, see *supra* note 9.

**31.** For the pertinent text of Rule 1.4, see *supra* note 11.

**32.** For the rule against "commingling", see Rule 1.15(a), *supra* note 9, which states in part that "[a] lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property". *State ex rel. Okl. Bar Ass'n v. Miskovsky*, Okl., 824 P.2d 1090, 1098 (1991).

**33.** For the rule against "simple conversion", see Rule 1.4(b), *supra* note 11, which states that "[w]here money or other property has been entrusted to any attorney for a specific purpose, he must apply it to that purpose.... and a refusal to account for and deliver over such money or property upon demand shall be deemed a conversion". *Miskovsky, supra* note 27 at 438.

**34.** Rule 1.4(c), *supra* note 11, provides that "[t]heft by conversion or otherwise of the funds of a client shall, if proven, result in disbar-

**III**

**MISHANDLING FUNDS**

 The Bar has charged Johnston with improperly managing the funds entrusted to him in violation of Rules 1.15 [30] and 1.4.[31] We employ three different culpability standards when evaluating *mishandling of funds:* (1) commingling; [32] (2) simple conversion; [33] and (3) misappropriation, i.e., "theft by conversion or otherwise." [34] The degree of culpability ascends from the first to the last. Each must be proved by clear and convincing evidence.[35]

 *Commingling* occurs when the client's funds are combined with the attorney's personal funds. Complete separation of a client's money from that of the attorney's is the only way in which proper accounting can be maintained.[36] When an attorney receives money, part of which is to be paid to a third person and part of which is for the attorney's fee, *all the*

ment." (Emphasis added.) These rules connote that "theft", rather than a mere simple conversion, will always dictate disbarment. *Miskovsky, supra* note 32 at 1101 n. 19.

**35.** The terms of Rule 6.12(c), Rules Governing Disciplinary Proceedings, 5 O.S.1981 Ch. 1, App. 1–A, are:

"To warrant a finding against the respondent in a contested case, the charge or charges *must be established by clear and convincing evidence....*" (Emphasis added).

**36.** When no means exists to account for money, it becomes a fungible unidentifiable property. Once money is combined, the only way in which a determination can be made of the divisible parts is the accounting methods employed. The attorney has exclusive reign over the management of funds entrusted to him. Keeping a client's money separate and distinct ensures that the money at *all* times is properly accounted for and can be shown to be distinct. This serves to prevent a lawyer from deliberately or mistakenly using any of the funds entrusted to him. "In their daily work lawyers commonly come into clients' funds. The trust placed in the lawyer owes its origin to the special professional status he occupies as a licensed practitioner. Public confidence in the practitioner is essential to the proper functioning of the profession. Few breaches of ethics are as serious as the act of commingling a client's funds and the unwarranted use of his money." *Raskin, supra* note 12 at 267.

*funds* not clearly identifiable as the attorney's must be kept separate.[37]

 Johnston admits that he withdrew from his trust account funds that were earmarked for payment of medical bills and placed them in his personal account. By failing to keep his money separate from that due the care givers, Johnston has commingled funds.

 The second level of culpability is *simple conversion.* Rule 1.4(b) establishes that simple conversion occurs when an attorney applies a client's money to a purpose other than that for which it was entrusted to him.[38] By taking out money that was in his trust account and paying himself rather than satisfying all the care givers, Johnston is guilty of simple conversion.[39]

 The third level of culpability is *misappropriation, i.e. "theft by conversion or otherwise."* This occurs when an attorney has *purposely* deprived a client of money by way of *deceit and fraud.*[40] A lawyer found guilty of intentionally inflicting *grave economic harm* in mishandling clients' funds is deemed to have committed this most grievous degree of offense.[41] A finding that the attorney did so *intentionally,* regardless of exceptional mitigating factors,[42] mandates the imposition of harsh discipline—disbarment.[43]

 The parties agree that Johnston *did not intend* to misappropriate his clients' money. The PRT also agreed and concluded that Johnston's misconduct grew out of his ignorance of proper procedures for holding and distributing the money entrusted to him. On *de novo* consideration, we agree with the PRT's conclusion and hold that discipline is warranted for respondent's mishandling of his clients' funds.

## IV

### OTHER MISCONDUCT

Johnston has been charged with other offenses, namely: (1) failing to give competent representation in violation of Rule 1.1;[44] (2) failing to act promptly on a matter for which he was hired in violation of Rule 1.3;[45] and (3) failing to communicate with his clients in violation of Rule 1.4.[46]

 Professional competence—acting promptly on a matter and communication with a client—is a *mandatory obligation* imposed upon attorneys. Albeit high, this obligation is the *minimum* we expect from a lawyer. It epitomizes professionalism. Anything less is a breach of a lawyer's duty to serve his client.[47] Johnston's failure to maintain these standards—through procrastination and neglectful behavior—warrants imposition of disciplinary sanction.

## V

### A FOUR–MONTH SUSPENSION IS AN APPROPRIATE SANCTION FOR RESPONDENT'S PAST PROFESSIONAL MISCONDUCT

 The court's responsibility in a disciplinary proceeding is not to punish but to inquire into and gauge a lawyer's continued fitness, with a view to safeguarding the interests of the public, of the courts

---

37. Rule 1.15(a), *supra* note 9; *Miskovsky, supra* note 32 at 1098–99.

38. *See supra* note 11 for the terms of Rule 1.4(b); *Miskovsky, supra* note 27 at 438.

39. It was not until after a grievance had been filed against Johnston that he made *full payment* to all of the care givers. Restitution of the clients' funds is not delivery of the money "upon demand". *State ex rel. Okl. Bar Ass'n v. Perkins,* Okl., 757 P.2d 825, 831 (1988). In the present case the demand was to deliver the funds to the health-care providers.

40. *Miskovsky, supra* note 27 at 438.

41. *Donnelly, supra* note 12 at 548.

42. *Raskin, supra* note 12.

43. *See* Rule 1.4(c), *supra* note 11; *Miskovsky, supra* note 32 at 1101 n. 19.

44. For the terms of Rule 1.1, see *supra* note 6.

45. For the terms of Rule 1.3, see *supra* note 7.

46. For the terms of Rule 1.4, see *supra* note 8.

47. *Raskin, supra* note 12 at 267.

and of the legal profession.[48] Imposition of discipline is designed to maintain these goals rather than to be a punitive measure for a lawyer's misconduct.[49]

The PRT adopted the parties' stipulation, recommending that Johnston be suspended from the practice of law for four months and pay all costs incurred in this proceeding.[50] Johnston's professional misconduct stems from one incident. He has now returned all of the residual funds he was holding and has paid in full all of the care givers. None of the clients' funds went to pay his attorney's fee.

 We recently imposed a three-month suspension sanction for a *single act* of commingling and conversion of client's funds.[51] Johnston is charged with not only commingling and conversion of funds, but also with making a false statement to the court, professional incompetence, failure to act promptly while representing his clients, and failure to communicate with the clients. While Johnston's post-complaint return of the clients' funds operates to bring *no* detriment to his clients, his actions nonetheless call for discipline. The PRT's recommendation that Johnston be suspended from the practice of law for a four-month period is approved. Within four months of the date of this opinion, Johnston shall pay costs incurred in this proceeding—$284.77.

Respondent stands suspended from the practice of law for four months from the day this opinion becomes final; costs shall be paid in full before his reinstatement.

HODGES, C.J., LAVENDER, V.C.J., and SIMMS, HARGRAVE, ALMA WILSON and SUMMERS, JJ., concur.

KAUGER and WATT, JJ., concur in part and dissent in part.

KAUGER, Justice, with whom WATT, J., joins, concurring in part, dissenting in part.

I agree that discipline should be imposed. However, I would impose a longer suspension because of the respondent's misrepresentation to the trial court.

**48.** *Donnelly, supra* note 12 at 546; *State ex rel. Okl. Bar Ass'n v. Colston,* Okl., 777 P.2d 920, 925 (1989); *State ex rel. Oklahoma Bar Ass'n v. Moss,* Okl., 682 P.2d 205, 207 (1983); *State ex rel. Oklahoma Bar Ass'n v. Harlton,* Okl., 669 P.2d 774, 777 (1983); *Raskin, supra* note 12 at 267.

**49.** *Raskin, supra* note 12 at 267.

**50.** One PRT panel member observed: "We've had the opportunity to see Robert L. Johnston

and to hear him and to watch him during these proceedings. We're both impressed by his appearance and impressed by his attitude. Both in appearance and attitude he is appropriate and even more than appropriate, impressive. He has candidly admitted incompetence in an area and that takes courage."

**51.** *Miskovsky, supra* note 27, 804 P.2d at 440.