1999 OK 9

**STATE of Oklahoma, ex rel. OKLA-HOMA BAR ASSOCIATION, Complainant,**

v.

**Robert I. MAYES, Jr., Respondent.**

**No. SCBD 4335.**

Supreme Court of Oklahoma.

Feb. 16, 1999.

As Corrected Feb. 23, 1999.

Janis Hubbard, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, Oklahoma, for Complainant.

John E. Douglas of Clark, Stakem, Wood & Douglas, P.C., Oklahoma City, Oklahoma, for Respondent.

LAVENDER, J.

¶ 1 Complainant, the Oklahoma Bar Association (complainant or OBA) initiated disciplinary proceedings against respondent, Robert I. Mayes, Jr., pursuant to the Rules Governing Disciplinary Proceedings (RGDP), Rule 6—Formal Proceedings Before Supreme Court and Professional Responsibility Tribunal, 5 O.S.1991, Ch. 1, App. 1–A, as amended. The parties submitted stipulations of fact, conclusions of law and an agreed recommendation of discipline to a trial panel of the Professional Responsibility Tribunal wherein respondent acknowledged certain violations of the RGDP and the Oklahoma Rules of Professional Conduct (ORPC), 5 O.S.1991, Ch. 1, App. 3–A, as amended. Complainant agreed to recommend to the trial panel and this Court a six month suspension from the practice of law as discipline, and respondent agreed to accept this recommendation. The trial panel held a hearing where respondent testified, numerous exhibits were admitted, and the stipulations, etc. were amplified. After the hearing, the stipulations, etc. were amended to clarify certain matters and to reflect respondent's testimony. In its written report the trial panel finds respondent guilty of misconduct and recommends a six month suspension. However, the panel also states in the report, a three month suspension would have been recommended but for the stipulation of the parties, complainant's recommendation and respondent's agreement to accept a six month suspension.

¶ 2 Although respondent continues to acknowledge his misconduct, he now requests this Court to consider a three month suspension, rather than six months, as the appropriate discipline. We reject his request. The amended stipulations, etc., together with their amplification through evidentiary materials submitted at the hearing, support a determination respondent is guilty of professional misconduct warranting a six month suspension. The costs of these proceedings in the amount of $1291.50 are also charged against respondent. The costs shall be paid within ninety (90) days from the date this opinion becomes final.[1]

## PART I. FACTS, PROFESSIONAL MISCONDUCT AND MITIGATION.

¶ 3 Respondent is a licensed attorney, with the majority of his practice consisting of representing persons accused of criminal offenses.[2] He, however, handles some personal injury claims on behalf of injured individuals. At the times giving rise to this matter, respondent did not personally manage his office's financial activities or watch over his office's financially related record-keeping requirements. He essentially left the day-to-day management of both his trust and operating bank account activities to Sharon Vann, his office manager/non-lawyer assistant, who he employed in 1991. Respondent gave Vann authority to use his signature stamp, to deposit money to both his trust and operating accounts and to write checks from both accounts—authority exercised by Vann without much, if any, supervision or oversight from him. Vann also had authority to open respondent's mail, including his bank statements.

¶ 4 Generally, respondent used an outside accountant to reconcile transactions or activities involving his operating and trust bank accounts only at a year's end. The record shows respondent gave so little attention to his practice's financial aspects, that he would rely on Vann to tell him whether he had earned from attorney fees funds which could

---

1. Rule 6.16 of the Rules Governing Disciplinary Proceedings (RGDP), 5 O.S.1991, Ch. 1, App. 1–A, provides that where discipline is imposed, the costs of the investigation, record and disciplinary proceedings shall be surcharged against the disciplined lawyer, unless remitted for good cause by this Court.

2. Our factual recitation is taken from the agreed amended stipulations of fact submitted by the parties, and the remainder of the record presented to us, which contains the transcript of the July 1998 hearing before a trial panel of the Professional Responsibility Tribunal, and numerous exhibits admitted at the hearing, including the depositions of Java Collins, Sharon Vann, Tony Blasier and respondent.

be accessed by him for his personal use—i.e. he essentially relied on Vann to decide the appropriateness of placing funds in his operating account and whether or not net proceeds or funds existed in the account. As we will detail, this way of running his law practice and his delegation of other responsibilities to Vann, proved to be serious mistakes on his part.

¶ 5   In April 1996 Mary Stake and Java Collins were injured in an automobile accident. Stake, who was more severely injured, apparently was a friend of Ms. Vann, and both Stake and Collins hired respondent to represent them in regard to claims arising from the accident. No misconduct is alleged regarding respondent's representation of Stake or the handling of her claim. The misconduct arises from the Collins representation and the management of her claim by respondent and Vann.

¶ 6   Respondent represented Collins on a contingent fee basis, but no written contingency-fee agreement was signed. Respondent delegated the handling of Collins' case to Vann—the delegation including authority to negotiate on Collins' behalf with the relevant insurance company. Evidence in the record is undisputed that: Mary Stake owned the vehicle involved in the accident; Collins was driving the Stake vehicle with Stake as passenger; the accident occurred when another vehicle swerved in front of the Stake vehicle on a highway in Tulsa, causing some type of one-vehicle crash of the Stake vehicle; and neither the vehicle swerving in front of the Stake vehicle, or its owner or driver, were ever apparently located. The insurer negotiated with was, therefore, Stake's insurance carrier, and Collins' claim was an uninsured motorist claim. There was also a medical payment claim under the applicable insurance policy.

¶ 7   After negotiation, Vann reached agreement with the insurer's adjuster, and the carrier issued two checks—one dated August 7, 1996 for $4500 for uninsured motorist benefits (UM) and the other dated July 25, 1996 for $1744.57 for "med-pay", the latter amount being the exact sum owed on Collins' medical bills. Both checks were made payable to Collins and Mayes and Associates, and the record shows they were received in respondent's office about the time of issuance.

¶ 8   Although neither respondent or Vann is charged with fraudulently endorsing Collins' signature on the checks, Vann apparently endorsed Collins' signature on the two checks, as Collins did not endorse either check. Respondent believes his office had Collins' permission to endorse her name, the same type of permission he generally obtained from other clients, in order that settlement monies would be available in a quicker time frame. Further, although there is a conflict in the record as to whether either respondent or Vann sought prior approval of the $4500 UM settlement amount from Collins, the record is undisputed that the **total** settlement agreement was not communicated to Collins by respondent or Vann prior to Vann's agreement to settle Collins' claim— the **total** settlement agreement being the carrier's agreement to pay by separate check for Collins' medical bills **and an additional** $4500 in UM benefits.

¶ 9   After the insurer's issuance of the two checks, Vann asked Collins to come to respondent's office in August 1996 to sign papers agreeing to certain disbursements of the settlement monies. Collins did visit respondent's office where she dealt with Vann, rather than respondent. Vann presented her with a "settlement sheet" showing receipt of a $4500 gross UM coverage payment with deductions of $1744.57 for medical bills, $1499.85 as respondent's one-third attorney fee and a balance to Collins of $1255.58. Neither respondent or Vann had notified Collins about receipt of the "med-pay" check when it was received in late July 1996 and Vann continued to withhold from Collins the fact a separate "med-pay" check for $1744.57 had been received from the insurer for payment of the medical bills. Collins' medical providers were not paid by respondent or Vann from the $4500 UM settlement monies despite the fact a sufficient amount to pay them was withheld for such purpose and despite the fact that, in reality, a separate insurance company check had been received by respondent's office in July 1996 to cover Collins' medical bills.

¶ 10   In that the medical bills remained unpaid, Collins was contacted by the medical providers for payment and she actually made, at least, some payments to them from her own funds. She, in turn, made numerous attempts to obtain an accounting from respondent's office, but either received no communication or misleading information from his office. Throughout the period August 1996 through December 1996, Vann repeatedly misrepresented to Collins in writing and by telephone that the medical bills had been paid. Three of the four medical provider bills were finally paid by Vann in November 1996 with funds respondent was entitled to as his attorney fee from a settlement reached on behalf of Mary Stake,[3] but the fourth medical provider bill was still not paid at that time.

¶ 11   In late December 1996, through her own efforts, Collins learned for the first time the insurance company had issued two checks, i.e. one for $4500 and another for $1744.57. After learning of the "med-pay" check's existence, Collins again contacted respondent's office to request a full accounting. In January 1997, she again visited respondent's office—again dealing with Vann, rather than respondent. At this January meeting Vann gave Collins $1163.63 in cash which Vann represented as the "med-pay" proceeds. When Collins inquired why she was only receiving this amount instead of the full "med-pay" proceeds, Vann advised her it was office policy to take one-third of any money the office receives. A settlement computation sheet given to Collins shows respondent receiving $580.94 of the $1744.57 "med-pay" check as attorney fees.

¶ 12   Collins filed a grievance with the OBA on January 6, 1997. In late January 1997 Collins contacted respondent directly by telephone, who only spoke briefly with her. He promised to look into the matter and get back with her in approximately two weeks. He did not get back with her in two weeks. The final medical provider bill was not paid until April 1997 when respondent deposited his own personal funds into his trust account to pay the bill. Respondent's trust account check (dated April 21, 1997) for this fourth

and final bill was mailed to the OBA with a request it be forwarded to Collins.

¶ 13   During a July 23, 1997 interview regarding the Collins grievance with Tony Blasier, OBA investigator, respondent stated to Blasier, as his accounting of the funds, that Vann had stolen the "med-pay" check. Respondent brought Vann into the interview and she confirmed she had stolen the check. In the same interview, Blasier requested from respondent all relevant bank records concerning the matter. Although respondent provided some of the requested bank records in a timely fashion, he did not provide all relevant records until December 1997.

¶ 14   The bank records show the $4500 UM settlement check was deposited into respondent's trust account in August 1996 and that this account, on July 31, 1996, had a beginning balance of $413.80, but by the end of August 1996 the balance was $9.82. By the end of August 1996 none of the medical provider bills totaling $1744.57 had been paid from the $4500 settlement funds deposited into the trust account. The bank records also show the $1744.57 "med-pay" check was deposited into his operating account in July 1996, rather than his trust account, and that the medical provider bills were not paid with the proceeds from this check. The operating account had a beginning balance of $39.90 on June 30, 1996 and an ending balance of $37.41 on July 31, 1996. Further, review of the trust and operating account records reveal Vann misappropriated for her own use part of both the $4500 UM settlement and the $1744.57 "med-pay" proceeds, and that part of the proceeds were improperly made available to respondent by Vann, rather than being used in a reasonably prompt manner to pay the outstanding medical provider bills.

¶ 15   Respondent did not review his records to determine how the monies had been used when promised during the January 1997 telephone conversation with Collins or when he was made aware of the complaint made against him to the OBA. Had respondent reviewed his bank records, as he should have done in order to make a full and fair re-

---

**3.** The record shows the Mary Stake settlement was for about $60,000, that respondent's earned attorney fee from this settlement was available in late October 1996 and part of this fee was used by Vann to pay three of the four Collins' medical providers.

sponse to the Collins grievance, he would have realized he had himself received funds from both the "med-pay" and UM settlement checks. He would also have learned that Vann's statement she had stolen the "med-pay" check was not an accurate statement, but was only partially true, the check having actually been deposited into respondent's own operating account. In other words, it was only partially true because Vann did not, in fact, steal all the proceeds from the "med-pay" check for her own use, and some of the proceeds actually were paid by Vann to respondent himself and for other office operating expenses.

¶ 16 Although respondent's representations to OBA investigator Blasier that Vann had stolen the "med-pay" check and similar statements in his deposition—and his encouragement to Vann during her deposition to testify she had stolen the "med-pay" check—were believed by him to be true when made, these statements were made without sufficient investigation on his part of the facts to be considered a full and fair disclosure of the facts and circumstances surrounding the grievance lodged against him by Collins. In such regard, respondent acknowledges he should have made a more sufficient inquiry for the purpose of providing a full and fair response, and that he certainly should have done so by his deposition in November 1997, which he did not do. However, there is no evidence respondent knew the representations he made were false when he made them.

¶ 17 Although respondent recognizes he is professionally responsible for the conduct of his employee, Vann, the parties have also stipulated, clear and convincing evidence is lacking that respondent was informed by Vann: when the two settlement checks arrived in his office; of her deposit of the "med-pay" check into his operating account; or that the medical providers had not been paid from the $4500 UM settlement check.[4] Further, after respondent received notice

from complainant of Collins' grievance, Vann admitted she had hidden from respondent both her receipt and deposit of the "med-pay" check and that she used some of its funds for her own personal purposes.

¶ 18 Since this matter concerning Vann's misappropriation and deception finally came to light, the record shows respondent has taken steps which should minimize the possibility of and help to prevent the recurrence of a similar situation. These steps include: direction to his bank that it may no longer accept his signature stamp as authorization for financial transactions, but must have his original signature; institution of an office policy that only he may open his bank statements [5]; and removing signature authority of anyone but himself from his operating and trust accounts. The record also shows that before this matter occurred, respondent did not keep separate sub-accounts of client funds placed in his trust account, but he presently does keep such separate sub-accounts. He also testified at the trial panel hearing that after this incident involving Ms. Collins, he no longer follows the practice of obtaining clients' permission for authority to endorse their signatures on settlement checks, but now requires each client personally endorse settlement checks.

¶ 19 The record further shows that prior to the events giving rise to this matter, respondent had not had problems of a similar nature involving Ms. Vann. Complainant also acknowledged at the trial panel hearing that Ms. Collins expressed her satisfaction to the OBA that an agreement had been reached for a recommended six month suspension. The parties have also stipulated that: Collins received all funds from the insurance proceeds she was owed; this is the first time respondent will have been subjected to professional discipline; and respondent has agreed to obtain law-practice management assistance.

4. To warrant a finding of misconduct against a respondent lawyer in a contested case, the charge or charges alleged must be established by clear and convincing evidence. Rule 6.12(c), RGDP, 5 O.S.1991, Ch. 1, App. 1–A; *State ex rel. Oklahoma Bar Ass'n v. Thomas*, 1995 OK 145, 911 P.2d 907, 909.

5. Respondent testified at the trial panel hearing that now, if he would not get his bank statements every month, he would contact his bank to ensure that a similar situation to the Collins affair is not repeated.

¶ 20 We also note, contained in the record are five exhibits offered by respondent and admitted at the trial panel hearing. The exhibits are five letters—three from attorneys, one from a Tulsa County District Judge, and one from a doctor who apparently treats respondent for a diabetic condition and other physical illnesses. The latter letter is dated in May 1998 and the other four letters in July 1998.[6] All three attorneys state they have known respondent for a number of years, two attest to his honesty and integrity, and the third to his fairness. The letter from the District Judge also attests to his honesty and integrity, and all four letters speak positively concerning his professional competence. The doctor's letter outlines the nature of his diabetic condition and other physical illnesses, and contains the doctor's opinion that for respondent to maintain a reasonable legal practice he must properly manage his physical disabilities.[7]

¶ 21 Finally, the parties have stipulated respondent's conduct violated the following Rules of the ORPC or RGDP: Rule 1.2, ORPC—in that he failed to have an offer of settlement communicated to Collins and to obtain her authorization to settle the case[8]; Rule 1.3 and Rule 1.4(a) and (b), ORPC—in that he failed to keep Collins informed of the status of her case, failed, himself, to determine the actual status of the matter, particularly after learning there was a problem with payment of the medical bills and payment to Collins, and he failed to timely forward Collins her portion of the settlement proceeds[9]; Rule 1.5(b) and (c), ORPC—in that his contingent fee agreement with Collins was not in writing[10]; Rule 1.15, ORPC and Rule 1.4,

6. In reviewing the three attorney letters and the one from the Tulsa County District Judge, it becomes clear two of the three attorney letters and the one from the District Judge are recommendation letters, on respondent's behalf, in regard to a teaching position or positions respondent was apparently seeking.

7. The doctor's letter also essentially states, respondent's condition results in easy fatigue, a tendency to collapse and an inability to maintain an optimum level of concentration without proper treatment. The letter further indicates that for health reasons, it is the doctor's opinion, respondent's case load/legal practice must be limited. We note, complainant has not alleged respondent's physical problems are of sufficient gravity that he is personally incapable of practicing law so as to invoke the provisions of Rule 10 of the RGDP, 5 O.S.1991, Ch. 1, App. 1–A—Suspension for Personal Incapacity to Practice Law.

8. Rule 1.2 of the Oklahoma Rules of Professional Conduct (ORPC), 5 O.S.1991, Ch. 1, App. 3–A provides:
(a) A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to paragraphs (b), (c), and (d) and shall consult with the client as to the means by which they are to be pursued. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.
(b) A lawyer may limit the objectives of the representation if the client consents after consultation.
(c) A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer

may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law.
(d) When a lawyer knows that a client expects assistance not permitted by the Rules of Professional Conduct or other law, the lawyer shall consult with the client regarding the relevant limitations on the lawyer's conduct.

9. Rule 1.3, ORPC, 5 O.S.1991, Ch. 1, App. 3–A, provides:
A lawyer shall act with reasonable diligence and promptness in representing a client.
Rule 1.4, ORPC, 5 O.S.1991, Ch. 1, App. 3–A, provides:
(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

10. Rule 1.5(b) and (c), ORPC, 5 O.S. Supp.1998, Ch. 1, App. 3–A, provide:
(b) When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation.
(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. A contingent fee agreement shall be in writing and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, whether the client

RGDP—in that the insurance proceeds were not properly safeguarded, nor were they ap-

plied to the purpose for which they were entrusted [11]; Rule 5.3(a), (b) and (c)(1) and

is to be liable for reimbursement of litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and, if there is a recovery showing the remittance to the client and the method of determination.

11. Rule 1.15, ORPC, 5 O.S.1991, Ch. 1, App. 3–A, provides:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the written consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

(d) Trust Accounts. A lawyer or law firm may create and maintain an interest-bearing demand trust account and may deposit therein all funds of clients to the extent permitted by applicable banking laws, that are nominal in amount or are on deposit for a short period of time. Maintenance of such trust account balances in noninterest-bearing trust accounts will still be permitted. The attorney electing to utilize interest-bearing trust accounts shall comply with the following provisions:

(1) the Interest–Bearing Demand Trust Account may be established with any bank or savings and loan association authorized by federal or state law to do business in Oklahoma and insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation; .

(2) the rate of interest payable on any interest-bearing demand trust account shall not be less than the rate paid by the depository institution to regular, nonattorney depositors. Higher rates offered by the institution to customers whose deposits exceed certain time or quantity minimums, such as those offered in the form of certificates of deposit, may be obtained by a lawyer or law firm so long as there is no impairment of the right to withdraw or transfer principal immediately (except as accounts generally may be subject to statutory notification requirements), even though interest may be sacrificed thereby;

(3) the depository institution shall be directed:

(A) to remit interest or dividends, as the case may be, on the average monthly balance in the account, at least quarterly, to the Oklahoma Bar Foundation, Inc.; and

(B) to transmit with each remittance to the Foundation a statement showing the name of the lawyer or the law firm for whom the remittance is sent and rate of interest applied; and

(4) in the event that any client asserts a claim against an attorney based upon such attorney's determination to place client advances in the Interest–Bearing Demand Trust Account because such balance is nominal in amount or held for a short period of time, the Foundation shall, upon written request by such attorney, review such claim and either:

(A) approve such claim (if such balances are found not to be nominal in amount or short in duration) and remit directly to the claimant any sum of interest remitted to the Foundation on account of such funds; or

(B) reject such a claim (if such balances are found to be nominal in amount or short in duration) and advise the claimant in writing of the grounds therefor. In the event of any subsequent litigation involving such a claim, the Foundation shall interplead any such sum of interest and shall assume the defense of the action.

Rule 1.4, RGDP, 5 O.S. Supp.1998, Ch. 1, App. 1–A, provides:

(a) All members of the Bar who are required under the Oklahoma Rules of Professional Conduct, Rule 1.15, to maintain a trust account for the deposit of clients' funds entrusted to said attorney, shall do so and furnish evidence thereof as hereinafter provided. The Executive Director of the Oklahoma Bar Association shall annually mail a card to each lawyer requesting the name of the bank or banks in which the lawyer carries any trust account, the name under which the account is carried and the account number. Provision will be made on the card for a response by lawyers who do not maintain a trust account and the reason for not maintaining said account. Lawyers shall have thirty days from the receipt of said inquiry to respond. Information received by the Association as a result of such inquiry shall remain confidential unless a grievance is filed against a lawyer which, in the opinion of the Professional Responsibility Commission, may warrant disciplinary action in regard to the handling of said trust account.

(2), ORPC—in that respondent failed to make reasonable efforts to ensure his non-lawyer assistant adhered to his professional obligations, he failed to make reasonable efforts to keep from ratifying Vann's misconduct, and he failed to take reasonable remedial action in regard to Vann's conduct[12]; and Rule 5.2, RGDP—in that, although respondent's statement(s) to the OBA during the investigation of this matter that Vann had stolen the "med-pay" check were partially true, the statements did not represent all the relevant facts and circumstances of the situation.[13] Based upon the parties' factual stipulations and our review of the record, we conclude respondent is guilty of professional misconduct in violation of Rules 1.2, 1.3, 1.4, 1.5, 1.15 and 5.3 of the ORPC and Rules 1.4 and 5.2 of the RGDP.

Failure of any lawyer to respond giving the information requested will be grounds for appropriate discipline.

(b) Where money or other property has been entrusted to any attorney for a specific purpose, he must apply it to that purpose. He may not avail himself of a counterclaim or set-off for fees against any money or other property of his client coming into his hands for such specific purpose, and a refusal to account for and deliver over such money or property upon demand shall be deemed a conversion. This does not apply to the retention of money or other property otherwise coming into the hands of a lawyer and upon which the lawyer has a valid lien for his services.

(c) Theft by conversion or otherwise of the funds of a client shall, if proved, result in disbarment.

(d) Controversies as to the amount of fees shall not be considered a basis for charges in a disciplinary proceeding unless it is made to appear that the amount demanded is extortionate or fraudulent.

12.  Rule 5.3, ORPC, 5 O.S.1991, Ch. 1, App. 3–A, provides:

With respect to a nonlawyer employed or retained by or associated with a lawyer:

(a) a partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;

(b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and

(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:

## PART. II.  DISCIPLINE.

¶ 22  In disciplinary proceedings this Court acts as a licensing court in the exercise of our exclusive original jurisdiction, not as a reviewing tribunal. *State ex rel. Oklahoma Bar Ass'n v. Downing*, 1990 OK 102, 804 P.2d 1120, 1122. Neither the parties' stipulations or findings of a trial panel of the Professional Responsibility Tribunal are binding on us insofar as the imposition of discipline is concerned. *Id.* It is our nondelegable, constitutional responsibility to decide the discipline warranted when an attorney is found to have engaged in professional misconduct. *Id.; State ex rel. Oklahoma Bar Ass'n v. Barnett*, 1997 OK 61, 940 P.2d 493, 495 (Court's duty in attorney misconduct cases is to independently determine the proper discipline).

(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or

(2) the lawyer is a partner in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

13.  Rule 5.2, RGDP, 5 O.S.*1991*, Ch. 1, App. 1–A, provides:

After making such preliminary investigation as the General Counsel may deem appropriate, the General Counsel shall either (1) notify the person filing the grievance and the lawyer that the allegations of the grievance are inadequate, incomplete, or insufficient to warrant the further attention of the Commission, provided that such action shall be reported to the Commission at its next meeting, or (2) file and serve a copy of the grievance (or, in the case of an investigation instituted on the part of the General Counsel or the Commission without the filing of a signed grievance, a recital of the relevant facts or allegations) upon the lawyer, who shall thereafter make a written response which contains a full and fair disclosure of all the facts and circumstances pertaining to the respondent lawyer's alleged misconduct unless the respondent's refusal to do so is predicated upon expressed constitutional grounds. Deliberate misrepresentation in such response shall itself be grounds for discipline. The failure of a lawyer to answer within twenty (20) days after service of the grievance (or recital of facts or allegations), or such further time as may be granted by the General Counsel, shall be grounds for discipline. The General Counsel shall make such further investigation of the grievance and response as the General Counsel may deem appropriate before taking any action.

¶ 23 Our responsibility is not to punish the offending lawyer, but to assess the offender's continued fitness to practice law. *State ex rel. Oklahoma Bar Ass'n v. Meek*, 1994 OK 118, 895 P.2d 692, 699. In such regard, we are required to exercise our responsibility with a view to safeguarding the interests of the public, the courts and the legal profession. *Id.* Also, a fit factor to be considered in arriving at appropriate discipline is the deterrent effect upon both the offending respondent and other attorneys who might contemplate similar conduct in the future. *State ex rel. Oklahoma Bar Ass'n v. McMillian*, 1989 OK 16, 770 P.2d 892, 899; *State ex rel. Oklahoma Bar Ass'n v. Hall*, 1977 OK 117, 567 P.2d 975, 978.

¶ 24 Other factors properly considered include comparing the circumstances in the matter at hand with previous disciplinary matters, and examining an attorney's past record of professional behavior. *Meek, supra*, 895 P.2d at 700. Mitigating circumstances are also often considered when assessing the appropriate measure of discipline. *State ex rel. Oklahoma Bar Ass'n v. Thomas*, 1995 OK 145, 911 P.2d 907, 913. Finally, although discipline should be administered fairly (i.e. evenhandedly), this Court has recognized that the extent of discipline must be decided on a case-by-case basis because each situation will usually involve different transgressions and different mitigating circumstances. *See State ex rel. Oklahoma Bar Ass'n v. Rozin*, 1991 OK 132, 824 P.2d 1127, 1130. Here, our independent review, and the combination of the above-delineated factors, leads us to conclude the appropriate discipline for respondent's professional misconduct is a six month suspension—a suspension agreed to by him—rather than a lesser suspension as he now argues is more appropriate.

¶ 25 Respondent realizes, as our cases have made plain, an attorney must supervise work done by lay personnel and a lawyer stands ultimately responsible for work done by his non-lawyer employees. *State ex rel. Oklahoma Bar Ass'n v. Miskovsky*, 1991 OK 88, 824 P.2d 1090, 1097. We have stated:

> While delegation of a task entrusted to a lawyer is not improper, it is the lawyer who must maintain a direct relationship with his client, supervise the work that is delegated and exercise complete, though indirect, professional control over the work product. The work of lay personnel is done by them as agents of the lawyer employing them.

*State ex rel. Oklahoma Bar Ass'n v. Braswell*, 1983 OK 63, 663 P.2d 1228, 1231–1232. The facts borne out by the parties' factual stipulations, together with their amplification at the trial panel hearing, show respondent fell woefully short of his obligation to supervise his office manager/non-lawyer assistant in her dealings with **respondent's client**, Ms. Collins or to make reasonable efforts to ensure that Vann's conduct was compatible with his professional obligations. The lack of supervision, coupled with the almost total delegation to Vann of his duties to Ms. Collins and his obligations as a practicing lawyer to see to it that money entrusted to him was properly used and accounted for, in the final analysis set the stage for permitting numerous violations of our rules governing an attorney's conduct.

¶ 26 The violations began at the outset of the representation by failure to reduce to writing the contingency-fee agreement, they continued throughout the representation in the form of failure to properly communicate with Ms. Collins and, ultimately, involved the mishandling and misapplication of client funds and funds entrusted to respondent's care for a specific purpose (i.e. the "med-pay" check proceeds). Further, when the problem was brought to his attention it still took him about three months, or until April 21, 1997, to remit to Collins the funds representing payment for the last medical bill—payment which should have occurred in August 1996, eight months earlier. Respondent's lack of attention to the matter even continued during the OBA's investigation.

¶ 27 Our cases have articulated a continuum of culpability in evaluating the mishandling of client funds. *State ex rel. Oklahoma Bar Ass'n v. Dunlap*, 1994 OK 81, 880 P.2d 364, 366–367. Commingling occurs when a lawyer fails to keep client money, or money accepted on the client's behalf, in a separate account from that of the attorney. *Id.* at 367; *State ex rel. Oklahoma Bar Ass'n*

v. *Johnston*, 1993 OK 91, 863 P.2d 1136, 1145. The next most serious offense occurs when an attorney uses a client's money for some purpose other than that for which it was intended. *Dunlap, supra*, 880 P.2d at 367; *State ex rel. Oklahoma Bar Ass'n v. Farrant*, 1994 OK 13, 867 P.2d 1279 (applying client payment intended for private investigator services to attorney's own fees); *State ex rel. Oklahoma Bar Ass'n v. Cummings*, 1993 OK 127, 863 P.2d 1164 (applying funds intended for deposition expenses toward claimed attorney fees). The most egregious offense, misappropriation, occurs when the attorney purposely deprives a client of money by way of deceit and fraud, i.e. theft by conversion or otherwise, and intentionally inflicts grave economic harm on his/her client. *Johnston, supra*, 863 P.2d at 1145. An attorney found guilty of this latter offense, i.e. theft by conversion or intentional misappropriation, results in disbarment. *Id.;* Rule 1.4(c), RGDP.

¶ 28 Although in the present case it is not appropriate to saddle respondent with responsibility for what appears to be Vann's intentional misappropriation, the record is sufficient to hold him responsible for commingling and simple conversion of, at least, some of the insurance proceeds. As we view the amended stipulations, etc. submitted, respondent has admitted responsibility for such violations. Plainly, it was respondent's lack of supervision and oversight that allowed Vann to commingle and convert money which should have either gone to Collins directly, or indirectly, for payment of her medical bills. In other words, it was his failure to live up to his obligation to supervise his employee and make reasonable efforts to ensure Vann's conduct was compatible with his professional obligations, and his lack of attention to fulfill his responsibility to see to it that Collins' funds were properly safeguarded and rightfully applied that permitted the mishandling of the funds. His oversight in regard to his financial and trust accounting responsibilities **was so lax** that he, himself—albeit unwittingly—received some of the money that either should have gone to Collins directly or to the payment of her medical bills. Thus, although the evidence does not warrant a finding respondent intentionally misappropriated any of his client's money or that he was aware of Vann's misappropriation or intent to misappropriate at a time when her conduct could have been avoided, respondent is professionally responsible for failure to appropriately safeguard the insurance proceeds and to rightfully apply those proceeds earmarked for payment of Collins' medical bills.

¶ 29 As *Dunlap, supra* sets out, this Court has assigned varying levels of discipline in matters involving the mishandling of client funds. 880 P.2d at 366. The range has been from public censure to disbarment, depending in part on the degree of harm to the client. *Id.* *Dunlap* also indicates that delay in payment to a client in mishandling-fund cases will also be a consideration in determining the appropriate discipline. *Id.* at 368. In our view, although no two cases are exactly alike, our cases show a six month suspension is plainly **within the zone of appropriate discipline** for the type of conduct respondent stands responsible.

¶ 30 In *State ex rel. Oklahoma Bar Ass'n v. Wilkins*, 1995 OK 59, 898 P.2d 147, an attorney was suspended for six months for failing to keep two clients reasonably informed about the status of their respective matters, failing to comply with requests for information, commingling and simple conversion of client funds, and not being honest with a client about his improper retention, as a set off for a prior attorney fee bill, of a portion of settlement proceeds received. A six month suspension was also deemed appropriate in *State ex rel. Oklahoma Bar Ass'n v. Williams*, 1995 OK 130, 911 P.2d 905, where an attorney was guilty of a conflict of interest, failure to keep property of third person separate from his own and applying trust account funds for purpose other than which they were entrusted. The attorney in *Williams* had once been previously disciplined by private reprimand during a 35 year legal career, but the parties had stipulated he had fully cooperated with the complainant during its investigation of him.

¶ 31 In *State ex rel. Oklahoma Bar Ass'n v. Geb*, 1972 OK 17, 494 P.2d 299, a twelve month suspension was found warranted for commingling a client's funds and failing to properly remit funds belonging to the client where the attorney had been previously pri-

vately reprimanded by the Board of Governors of the OBA. In *Johnston, supra,* 863 P.2d at 1146, a four month suspension was approved for a lawyer's commingling and conversion of funds, a false statement to a court, professional incompetence, failure to act promptly on behalf of his clients and failure to communicate with them. Johnston had come before this Court on the parties' agreed stipulation of facts, conclusions of law, mitigating factors and the recommendation for a four month suspension. Like the present case, no previous discipline was involved in *Johnston.* In *Cummings, supra,* we decided a one year suspension was appropriate for commingling and conversion of funds by impermissibly taking money entrusted by client for specific purpose and applying it toward a claimed fee, where the lawyer had twice been previously disciplined—once by a private reprimand before the Professional Responsibility Commission and once by public censure from this Court.

¶ 32 As can be seen by the above cases, a six month suspension cannot be considered too harsh for this respondent's professional misconduct. He stands responsible not only for failure to properly handle his client's funds by commingling and simple conversion, but serious deficiencies in managing his law practice in conformity with his professional obligations in respect to supervision and oversight of his non-lawyer assistant, and in respect to communicating with his client. He also failed to have his contingency-fee contract reduced to writing as our rules require. Further, even when the problem with payment of Collins' medical bills was brought to his attention, a significant delay followed before he paid the final bill. Taking into account the suitable factors to be considered, a six month suspension—rather than some lesser suspension—is warranted for respondent's professional misconduct.

¶ 33 Therefore, **RESPONDENT IS SUSPENDED FROM THE PRACTICE OF LAW FOR SIX MONTHS FROM THE DATE THIS OPINION BECOMES FINAL. RESPONDENT IS ALSO ORDERED TO PAY THE COSTS OF THIS DISCIPLINARY PROCEEDING IN THE AMOUNT OF $1291.50 WITHIN NINETY**

**(90) DAYS FROM THE DATE THIS OPINION BECOMES FINAL.**[14]

¶ 34 SUMMERS, C.J., HARGRAVE, V.C.J., and HODGES, OPALA, ALMA WILSON, KAUGER, and WATT, JJ., concur.

¶ 35 SIMMS, J., concurs in result.

14. Respondent is informed that he shall comply with Rule 9.1, RGDP—Notice to Clients; Lists of Other Bars to Which Admitted, 5 O.S.1991, Ch. 1, App. 1–A.