2005 OK 26

**STATE of Oklahoma, ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**Roland V. FUNK, Respondent.**

**SCBD No. 4791.**

Supreme Court of Oklahoma.

April 5, 2005.

WINCHESTER, V.C.J.

¶1 The Oklahoma Bar Association ("OBA") filed a complaint against Respondent, a licensed attorney in Oklahoma, pursuant to Rule 6, RGDP, 5 O.S.2001, Ch. 1, App. 1–A.[1] The complaint and amended complaint, together, state three counts, representing a grievance filed by a Tulsa lawyer who was hired in 2003 to represent Jeffrey Myers, a former client of Respondent's, in a personal injury action previously settled by Respondent in December 1998. In its Trial Panel Report, the Trial Panel of the Professional Responsibility Tribunal adopted the parties'

joint stipulations as to certain factual matters[2] and recommended the following: that this Court suspend Respondent from the practice of law for 1 year, with 30 days actually to be served and the remaining 335 days of said 1 year suspension to be suspended or probated with Respondent to complete Trust Account School and Ethics School; with Respondent to submit to an evaluation of his law office and practice by Jim Calloway, Management Assistance Program Director, and follow all recommendations made by Mr. Calloway; and that Respondent pay the costs of the investigation, record, and proceedings associated herewith, as set forth in Complainant's Amended Application to Assess Costs.[3] The total amount set forth in the Amended Application to Assess Costs is $3,481.93. We disagree.

¶2 The issues before us concern: 1) whether Respondent indeed violated the Oklahoma Rules of Professional Conduct (ORPC), 5 O.S.2001, Ch. 1, App. 3–A, Rule 1.2, 1.3, 1.4, 1.15, 8.1(a), 8.4(c) and 1.15(a); 2) whether Respondent engaged in conduct that violated Rules 1.4, 5.2 and 1.4(b), Rules Governing Disciplinary Proceedings (RGDP), 5 O.S.2001, Ch. 1, App. 1–A; and 3) whether the Trial Panel's recommendations constitute appropriate disciplinary sanctions to be imposed for Respondent's conduct. We hold that Complainant failed to establish the factual allegations against Respondent contained in Count I and Count II by clear and convincing evidence. We further hold that Complainant established the factual allegations against Respondent contained in Count III by clear and convincing evidence and as such, some discipline is warranted. Respondent's behaviors are less egregious than those of attorneys who have been suspended for three months. Accordingly, we publicly reprimand Respondent and admonish him that improprieties in clients' financial matters will not be condoned. In the case at bar, where Respondent has prevailed on two

---

1. Rule 6, Formal Proceedings Before Supreme Court and Professional Responsibility Tribunal, sets forth the procedures applicable to such proceedings.

2. The parties did not stipulate regarding discipline; nor did they stipulate that Respondent's

conduct in fact violated the Oklahoma Rules of Professional Conduct.

3. The Trial Panel Report does not reference Respondent's alleged violations of Rule 1.2, ORPC, and Rule 1.4, RGDP.

of the three counts, we hold that good cause exists for reducing the costs sought by the OBA, to one-third of the $3,481.93 requested in its Amended Application. Accordingly, costs to be assessed against Respondent are therefore reduced to $1,160.64, to be paid within ninety days of the effective date of this opinion. *State ex rel. Oklahoma Bar Ass'n. v. Israel,* 2001 OK 42, ¶ 32, 25 P.3d 909, 916.

## STANDARD OF REVIEW

¶ 3 This Court has exclusive original jurisdiction over Bar disciplinary matters. *State ex rel. Okl. Bar Ass'n. v. Donnelly,* 1992 OK 164, ¶ 11, 848 P.2d 543, 545. Our standard of review is *de novo. State ex rel. Okl. Bar Ass'n. v. Lloyd,* 1990 OK 14, ¶ 8, 787 P.2d 855, 858. Since our cognizance of disciplinary proceedings is not shared with any other institution, we must supervise every aspect of the Bar's adjudicative process by our *de novo* consideration. As such, the conduct of bar disciplinary functions is distinguishable from trial *de novo* and from our *de novo* appellate review on the record, the former a retrial in a different court, the latter, an independent, non-deferential examination of another tribunal's record. *State ex rel. Oklahoma Bar Ass'n. v. Johnston,* 1993 OK 91, ¶ 13, n. 13, 863 P.2d 1136, 1142, n. 13. We are not bound by the trial authority's findings nor its assessments as to weight or credibility of the evidence. *State ex rel. Okl. Bar Ass'n. v. Raskin,* 1982 OK 39, ¶ 11, 642 P.2d 262, 265. Indeed, a thorough and complete exploration of all relevant facts is mandatory in our *de novo* consideration of matters to regulate the practice of law and legal practitioners. *Tweedy v. Okl. Bar Ass'n.,* 1981 OK 12, ¶ 4, 624 P.2d 1049, 1052. At the outset, we hold the record is adequate for this Court's *de novo* consideration of all essential facts, and for crafting the appropriate discipline.

## *STIPULATION OF FACTS*

¶ 4 The parties agreed to the following factual stipulations, which we quote verbatim:

¶ 5 "Respondent is a member of the Oklahoma Bar Association and is licensed to practice law by the Supreme Court of the State of Oklahoma. The Respondent was so licensed at all times relevant to this Complaint.

¶ 6 "This proceeding was brought pursuant to Rule 6, Rules Governing Disciplinary Proceedings ("RGDP"), 5 O.S. ch. 1, app. 1–A (Supp.1997), and concerns allegations that the Respondent violated the Oklahoma Rules of Professional Conduct ("ORPF"), 5 O.S. ch. 1, app. 3–A (Supp.1997).

¶ 7 "The official Oklahoma Bar Association roster address of the Respondent is: Roland V. Funk, OBA # 3182, PMB—295, 10026—A S. Mingo Road, Tulsa, OK 74135–5700.

¶ 8 "The Respondent was licensed by the Oklahoma Supreme Court on September 30, 1977, and has never before been the subject of discipline by the Supreme Court or the Professional Responsibility Tribunal or even the subject of a grievance referred by the Office of General Counsel for investigation.

## COUNT I

¶ 9 The parties stipulated to the following facts, with regard to Count I of the Complaint.

¶ 10 "In December 1998, Jeffrey D. Myers ("Myers") was a resident of Tulsa, Oklahoma, and stationed in Arizona on active duty with the U.S. Marines.

¶ 11 "On December 1, 1998, while on leave in Tulsa, Myers was injured in an automobile accident with a vehicle owned by Rhema Bible Church, d/b/a Kenneth Hagin Ministries ("Rhema"), and driven by Larry Dobbs, an employee thereof.

¶ 12 "There was no issue as to liability. Dobbs' vehicle turned in front of Myers. Myers was without fault.

¶ 13 "Myers suffered personal injuries and his vehicle was totaled, in that the cost of repairs exceeded the value of the vehicle.

¶ 14 "Within days of the accident, Myers retained the Respondent to settle with Rhema and its insurer, Travelers Insurance Company ("Travelers"), for his personal injuries.

¶ 15 "On December 8, 1998, Myers returned to duty in Arizona.

¶ 16 "Myers sought and was provided medical treatment by the military after returning to duty."

¶ 17 "Myers was charged $6,349.80 in claims by medical care providers.

¶ 18 "On December 14, 1998, Travelers claims adjuster Dawn Smith ("Smith") sent the Respondent a settlement check for $2,500.00 along with a release for Myers to sign.

¶ 19 "On December 18, 1998, the Respondent endorsed on the $2,500.00 settlement check his signature and that of Myers with the notation "PA" to indicate that he had authority to endorse the check on behalf of Myers by virtue of a Power of Attorney purportedly executed by Myers.

¶ 20 "The Respondent deposited only $1,700.00 of the settlement check into his client trust account on December 18, 1998, and withheld $800.00.

¶ 21 "Over the next several months, Smith asked the Respondent to have Myers sign the Release and return it.

¶ 22 "The Respondent did not return a Release signed by Myers. He advised her that the settlement funds remained in the client trust account in escrow until a Release signed by Myers was retained. The Respondent did not return a Release to Smith because Myers did not return one to him. ˉ

¶ 23 "On October 5, 1999, the Respondent's client trust account balance fell below $2,500.00 and remained below that balance until the Respondent made a deposit on [October]⁴ 19, 1999.

¶ 24 "In October 2000, Myers was discharged from the U.S. Marines, returned to Tulsa, and went to the Respondent's office to determine the status of his case. Myers learned at that time that the case had "settled" for $2,500.00.

¶ 25 "Myers was, and remains, adamant that he did not authorize settlement and that

4. A scrivener's error in the stipulations states the date as "November 18, 1999," but the parties agreed that the correct date was "October 18, 1999."

the Respondent never discussed any proposed settlement with him.

¶ 26 "Although Travelers had considered the claim settled since it had issued the settlement check in 1998, Smith agreed to revisit the matter.

¶ 27 "Myers hired new counsel, Kathryn Herwig ("Herwig") in November 2000 regarding his claim against Rhema/Travelers.

¶ 28 "On November 13, 2000, Herwig filed a Petition on behalf of Myers, *Jeffrey Douglas Myers v. Larry Dobbs, et. al,* CJ–2000–5803, District Court of Tulsa County.

¶ 29 "On March 15, 2001, attorneys Philip and Linda McGowan had filed an Answer on behalf of the defendants in which the defendant claimed that 'a Release was negotiated and entered between Defendant Rhema, on behalf of itself and Larry Dobbs, with Plaintiff and (the Respondent) . . .'

¶ 30 "On August 29, 2001, the Respondent advised the McGowan firm that, in December 1998, Myers and the Respondent had considered the case settled.

¶ 31 "Pursuant to an application of the McGowan firm, the trial court entered an order on October 8, 2001, which allowed the defendant to amend its Answer and withdraw its affirmative defense of release.

¶ 32 "The parties settled that case in January 2002 and an agreed judgment was entered on behalf of Myers in the amount of $88,000.

¶ 33 "On January 8, 2002, all parties executed a Settlement Agreement by which all claims were settled upon payment of $88,000.00 to Myers.

¶ 34 The OBA contends in Count I of the Complaint that the conduct of Respondent violated Rules 1.2, 1.3, 1.4 and 1.15 of the Oklahoma Rules of Professional Conduct (ORPC), and further violated Rule 1.4 of the Rules Governing Disciplinary Proceedings (RGDP), and thereby constitutes grounds for professional discipline.⁵ We disagree.

5. *Oklahoma Rules of Professional Conduct (ORPC), codified at 5 O.S.2001, Ch. 1, App. 3–A:*

**Rule 1.2** Scope of Representation, provides:

**432**

(a) A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to paragraphs (b), (c), and (d) and shall consult with the client as to the means by which they are to be pursued. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

(b) A lawyer may limit the objectives of the representation if the client consents after consultation.

(c) A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law.

(d) When a lawyer knows that a client expects assistance not permitted by the Rules of Professional Conduct or other law, the lawyer shall consult with the client regarding the relevant limitations on the lawyer's conduct.

**Rule 1.3** *Diligence*, provides:
A lawyer shall act with reasonable diligence and promptness in representing a client.

**Rule 1.4** *Communication*, provides:
(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

**Rule 1.15** *Safekeeping Property*, provides:
(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the written consent of the client or third person. Other property shall be identified as such and appropriately safe-guarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.
(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of

their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

(d) Trust Accounts. A lawyer or law firm may create and maintain an interest-bearing demand trust account and may deposit therein all funds of clients to the extent permitted by applicable banking laws, that are nominal in amount or are on deposit for a short period of time. Maintenance of such trust account balances in non-interest-bearing trust accounts will still be permitted. The attorney electing to utilize interest bearing trust accounts shall comply with the following provisions:

(1) the Interest–Bearing Demand Trust Account may be established with any bank or savings and loan association authorized by federal or state law to do business in Oklahoma and insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation;

(2) the rate of interest payable on any interest-bearing demand trust account shall not be less than the rate paid by the depository institution to regular, non-attorney depositors. Higher rates offered by the institution to customers whose deposits exceed certain time or quantity minimums, such as those offered in the form of certificates of deposit, may be obtained by a lawyer or law firm so long as there is no impairment of the right to withdraw or transfer principal immediately (except as accounts generally may be subject to statutory notification requirements), even though interest may be sacrificed thereby;

(3) the depository institution shall be directed:

(A) to remit interest or dividends, as the case may be, on the average monthly balance in the account, at least quarterly, to the Oklahoma Bar Foundation, Inc.; and

(B) to transmit with each remittance to the Foundation a statement showing the name of the lawyer or the law firm for whom the remittance is sent and rate of interest applied; and

(4) in the event that any client asserts a claim against an attorney based upon such attorney's determination to place client advances in the interest-bearing demand trust account because such balance is nominal in amount or held for a short period of time, the Foundation shall, upon written request by such attorney, review such claim and either:

(A) approve such claim (if such balances are found not to be nominal in amount or short in duration) and remit directly to the claimant any sum of interest remitted to the Foundation on account of such funds; or

(B) reject such a claim (if such balances are found to be nominal in amount or short in duration) and advise the claimant in writing of the grounds therefore. In the event of any subsequent litigation involving such a claim, the Foundation shall interplead any such sum of interest and shall assume the defense of the action.

***Rules Governing Disciplinary Proceedings (RGDP), codified at 5 O.S.2001, Ch. 1, App. 1–A:***

¶ 35 The OBA contends that Respondent failed to advise Myers he had negotiated a settlement and that Travelers had sent a settlement check. However, Myers actually admitted at the October 13, 2003, hearing before the Trial Panel that he was advised of the settlement offer, received Respondent's correspondence which contained the Release, and discarded it. In the face of Myers' admission, we note that the OBA failed to amend its Complaint against Respondent, instead leaving in those allegations contrary to Myers' own testimony, and continuing to argue said allegations, even in its brief to this Court.

¶ 36 Respondent's testimony details his oral and written communications with Myers regarding settlement negotiations and the Release. Respondent testified that he in fact communicated offers to settle to Myers, and that Myers informed him he would accept the $2,500.00 offer after rejecting offers of $1,500.00 and $2,000.00. Respondent's testimony is corroborated by that of Jim Rutherford, an employee of the Whitten, Nelson McGuire law firm, who obtained Myers' file from storage and copied it, upon Respondent's request. Rutherford testified that he saw the letters from Respondent to Myers inside the file, as he copied its contents. He also testified Respondent would not have had the opportunity or the time to produce these letters in the short interval of time between Respondent's copy request and the time Rutherford copied its contents.

¶ 37 Respondent testified that Myers told him he was unhappy with Travelers' refusal to meet his request to purchase a plane ticket for Myers' return to Arizona, back in December, 1998, after the accident. Indeed, this is corroborated by Myers' own testimony. Further corroboration is obtained from the testimony of Travelers' adjuster, Dawn Smith, who stated her computer notes detailed the progression of events to which Respondent testified, including their conversations regarding Myers' failure or refusal to execute and return the Release.

¶ 38 In view of the testimony of Myers, Respondent and Rutherford, along with that of Smith, we determine that Respondent not only advised Myers of settlement negotiations with Travelers and the status of the case, but also that Myers accepted the $2,500.00 settlement offer, and received Respondent's correspondence confirming this settlement, along with the Release.

¶ 39 Respondent testified that he contacted Myers in December 1998, to inform him he had received the settlement check from Travelers. Respondent stated that he mailed a letter and the Release obtained from Travelers, on January 11, 1999. The OBA asserts this correspondence was written after-the-fact, although it fails to provide any evidence, much less clear and convincing evidence, to

**Rule 1.4** *Money transactions,* provides:
(a) All members of the Bar who are required under the Oklahoma Rules of Professional Conduct, Rule 1.15, to maintain a trust account for the deposit of clients' funds entrusted to said attorney, shall do so and furnish evidence thereof as hereinafter provided. The Executive Director of the Oklahoma Bar Association shall annually mail a card to each lawyer requesting the name of the bank or banks in which the lawyer carries any trust account, the name under which the account is carried and the account number. Provision will be made on the card for a response by lawyers who do not maintain a trust account and the reason for not maintaining said account. Lawyers shall have thirty days from the receipt of said inquiry to respond. Information received by the Association as a result of such inquiry shall remain confidential unless a grievance is filed against a lawyer which, in the opinion of the Professional Responsibility Commission, may warrant disciplinary action in regard to the handling of said trust account.

Failure of any lawyer to respond giving the information requested will be grounds for appropriate discipline.
(b) Where money or other property has been entrusted to any attorney for a specific purpose, he must apply it to that purpose. He may not avail himself of a counterclaim or set-off for fees against any money or other property of his client coming into his hands for such specific purpose, and a refusal to account for and deliver over such money or property upon demand shall be deemed a conversion. This does not apply to the retention of money or other property otherwise coming into the hands of a lawyer and upon which the lawyer has a valid lien for his services.
(c) Theft by conversion or otherwise of the funds of a client shall, if proved, result in disbarment.
(d) Controversies as to the amount of fees shall not be considered a basis for charges in a disciplinary proceeding unless it is made to appear that the amount demanded is extortionate or fraudulent.

support its assertion. A thorough review of the complete record reveals that this is an instance of competing veracities. Evidence that Respondent actually mailed correspondence to Myers is Respondent's own testimony, corroborated at least in part by that of Jim Rutherford, Smith, the adjuster, and at times, Myers himself. However, the *only* evidence Myers did not receive any correspondence from Respondent is Myers' own testimony, which is conflicting on several issues.

¶ 40 Myers admits to receiving Travelers' Release from Respondent, stating he misplaced it, but the OBA continues to argue Respondent never sent the Release to him, and that the correspondence sent by Respondent to Myers containing the Release was "manufactured." This argument, in particular, is contrary to the evidence before us.

¶ 41 The OBA also argues in Count I that the $800.00 Respondent withheld from Travelers' settlement check constituted a legal fee for his work on Myers' settlement. Respondent contends he deposited the settlement check in his client trust account and at the same time, removed $800.00 from that account, for payment of fees earned in another case, completely unrelated to Myers' case and settlement. The OBA failed to present any evidence to refute this. Its "belief" that these monies constituted a legal fee in

Myers' case falls far short of clear and convincing evidence.

¶ 42 Since we determine that OBA's factual contentions that form the basis of its allegations in Count I lack merit, we hold that the above-described conduct of Respondent was in keeping with Rules 1.2, 1.3, 1.4 and 1.15 of the Oklahoma Rules of Professional Conduct (ORPC), and further in accordance with Rule 1.4 of the Rules Governing Disciplinary Proceedings (RGDP), and does not constitute grounds for professional discipline. We hold that the OBA failed to establish by clear and convincing evidence the allegations contained in Count I of its Complaint.

## COUNT II

■ ¶ 43 The OBA contends that Respondent's conduct alleged in Count II of the Complaint violated Rules 8.1(a) and 8.4(c), ORPC, and Rule 5.2, RGDP, and constitutes grounds for professional discipline.[6] We disagree.

¶ 44 The parties stipulated to the following facts, with regard to Count II.

¶ 45 "On January 25, 2001, the Office of General Counsel received a grievance in this regard from Herwig.

¶ 46 "By letter dated March 14, 2001, Respondent filed a written response to the grievance.

---

6. *Oklahoma Rules of Professional Conduct (ORPC), codified at 5 O.S.2001, Ch. 1, App. 3–A:*
**Rule 8.1(a)** *Bar Admission and Disciplinary Matters* provides:
An applicant for admission to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:
(a) knowingly make a false statement of material fact; ...
**Rule 8.4(c)** *Misconduct* provides:
It is professional misconduct for a lawyer to:
\* \* \*
(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; ...
*Rules Governing Disciplinary Proceedings (RGDP), codified at 5 O.S.2001, Ch. 1, App. 1–A:*
**Rule 5.2** *Investigations* provides:
After making such preliminary investigation as the General Counsel may deem appropriate, the General Counsel shall either (1) notify the person filing the grievance and the lawyer that the allegations of the grievance are inadequate, incomplete, or insufficient to warrant the further

attention of the Commission, provided that such action shall be reported to the Commission at its next meeting, or (2) file and serve a copy of the grievance (or, in the case of an investigation instituted on the part of the General Counsel or the Commission without the filing of a signed grievance, a recital of the relevant facts or allegations) upon the lawyer, who shall thereafter make a written response which contains a full and fair disclosure of all the facts and circumstances pertaining to the respondent lawyer's alleged misconduct unless the respondent's refusal to do so is predicated upon expressed constitutional grounds. Deliberate misrepresentation in such response shall itself be grounds for discipline. The failure of a lawyer to answer within twenty (20) days after service of the grievance (or recital of facts or allegations), or such further time as may be granted by the General Counsel, shall be grounds for discipline. The General Counsel shall make such further investigation of the grievance and response as the General Counsel may deem appropriate before taking any action.

¶ 47 "In that response, the Respondent reported (a) that Myers executed a contract which included a Power of Attorney clause, (b) that he advised Myers of settlement negotiations and a settlement offer, (c) that Myers told him to accept the $2,500.00 settlement offer, (d) that he advised Myers upon receipt of the settlement documents and check, (e) that he sent Myers a Release in January 2000 for Myers to execute and return, (f) that the settlement proceeds were deposited into his trust account where the proceeds remain 'to this date,' (g) that he sent to Myers letters dated January 11th, February 19th and June 21st, 1999, (h) that he 'spoke with Jeff Myers numerous times regarding the various issues,' (i) that he sent to Smith letters dated January 9th, April 7th and September 29, 2000, (j) that he mailed a $2,500.00 check to Smith by letter dated September 29, 2000, and (k) that he talked with Smith on multiple occasions about Myers' refusal to execute and return the Release.

¶ 48 OBA contends statements in Respondent's written response to the grievance, by letter dated March 14, 2001, were false. Respondent stated in his response that: 1) Myers executed a contract that included a Power of Attorney clause; 2) he advised Myers of settlement negotiations and a settlement offer; 3) Myers told him to accept the $2,500.00 settlement offer; 4) he advised Myers upon receipt of the settlement documents and check; 5) he sent Myers a Release in January 2000 for Myers to execute and return; 6) settlement proceeds were deposited into his trust account where the proceeds remain "to this date"; 7) he sent letters to Myers dated January 11, February 19 and June 21, 1999; 8) he "spoke with Jeff Myers numerous times regarding the various issues"; 9) he sent to Smith letters dated January 9, April 7 and September 29, 2000; 10) he mailed a $2,500.00 check to Smith by letter dated September 29, 2000; and 11) he talked with Smith on multiple occasions about Myers' refusal to execute and return the Release.

¶ 49 The OBA contends that Respondent's March 14, 2001, written response did not provide a full and fair disclosure of all pertinent facts. In this regard, the OBA asserts that items 1 through 11, above, were intentional misrepresentations and that none of the statements were true. Respondent vehemently states that indeed, all of these statements are true. Once again, a thorough review of the evidence before us reveals that this is an instance of competing veracities.

¶ 50 The OBA provides no evidence to support its contention, much less clear and convincing evidence, but merely relies on the testimony of Myers. Myers' conflicting testimony occurs again, with regard to the existence of a contract between him and Respondent. Myers testified before the Trial Panel that Respondent "might have" had a contract at their initial meeting in early December 1998. However, Myers testified at his deposition in September, 2001 that he actually signed a contract and misplaced his copy thereof. This tends to corroborate Respondent's testimony before the Trial Panel that Myers signed a medical release, filled out a one page information sheet and signed his standard contingency contract, during their meeting after the accident, early December 1998. Respondent stated that his standard contingency contract, in 1998, included a power of attorney to receive documents and sign checks on behalf of a client, provisions we note are standard in the industry for personal injury attorneys. In addition, it is noteworthy that Myers resolved the property settlement portion of his claim himself, contrary to his testimony at the October 13, 2003, hearing before the Trial Panel.

¶ 51 The record reflects that Myers told Respondent he might change his mind and reject the $2,500.00 settlement offer, and was returning to sick bay. Accordingly, Respondent informed Smith in March or April 1999 that Myers might change his mind, and had failed to sign and return the Release. Respondent's testimony in this regard is corroborated by Smith's.

¶ 52 Respondent testified that Smith gave him the option to return the settlement check and that he conveyed this option to Myers. He also testified that he requested additional medical information and records from Myers, both by telephone and via three letters, to determine whether Myers was experiencing additional or continuing symptoms. Myers

failed to supply this additional information to Respondent.

¶ 53 We also find it noteworthy that Myers' discharge physical, which occurred prior to his discharge from the military on December 16, 1999, reflected he had no continuing injuries, no complaints of pain, and was not taking any medications. Myers' medical records reflect he was found to be medically fit for discharge and received a reenlistment code of "RE 1–A," the highest medical rating for reenlistment. After his discharge, Myers met with Respondent on March 10, 2000. Respondent was employed at the law firm of Whitten, McGuire at the time, and they met at the firm's offices. Respondent referred Myers to Dr. David Traub, and Myers informed Dr. Traub he had been broad-sided and suffered continuing back problems. The record establishes that this is the first reference to "broadsided" and in fact is in direct contradiction to Myer's earlier accounts of the accident and the police report of the accident. Dr. Traub's notes are vastly different from Myers' previous physical condition of June 1999, when he was found fit for duty, with two normal MRI or CT scans in 1999, was sent back to duty by Marine medical personnel and received a normal discharge physical in December 1999, with no complaints or symptoms, sans medications. Indeed, we are struck by the stark contrast of Myers' physical condition after the accident in December 1998 and upon discharge from the Marines in December 1999, with no pain, symptoms and fit for duty, and his subsequent medical condition when he visited Dr. Traub in March 2000.

¶ 54 On August 24, 2000, a CT scan revealed a slight bulging disc in Myers' lumbar-sacral area, a condition not present in Myers' previous MRI's and CT scans. In view of this, Respondent met with Myers and informed him of potential problems that could arise from these glaring discrepancies in physical condition. He testified that he told Myers the military would expect reimbursement if Myers settled for a significant amount over $2,500.00. Respondent states that it is his belief the issue of informing the

military of a greater recovery constitutes the actual reason Myers hired other counsel.

¶ 55 Respondent testified that he telephoned Smith to advise her he was returning the settlement check on September 29, 2000. Five days later, Smith called him and said she could not accept the check, because Travelers' counsel intended to defend their position the case had been settled back in December 1998. Smith testified that Respondent acted in good faith, in his dealings with her and with Travelers. It appears undisputed that on numerous occasions, Respondent requested the OBA's investigator, Jim Yandell, obtain Smith's adjuster file with computer notes, to corroborate Respondent's version of the facts. Smith testified that indeed she had computer notes which she had entered contemporaneously with their telephone conversations, but that Yandell never requested the notes. In addition, she testified on December 3, 2003, before the Trial Panel, that these computer records did corroborate Respondent's version of the facts. However, the OBA and Yandell still had failed to request and obtain these records. She testified that Respondent's letters corresponded to certain key events in the matter's progression, and that this was evidenced in her contemporaneously produced notes of telephone conversations with him. We determine this evidence to be of utmost importance, in ascertaining the veracity of Respondent, versus the veracity of Myers as to these issues.

¶ 56 Unlike the potential to manufacture correspondence after-the-fact, contemporaneously written computer records of the Travelers' adjuster could not, and were not, manufactured after-the-fact. Indeed, their very existence confirms the veracity of Respondent's assertions in this regard. The idea that Respondent would make false, oral representations to Smith and then, months or perhaps even years later, generate correspondence to corroborate past false, oral representations strikes us as a practical impossibility. Further, Smith's testimony that Travelers closed Myers' file and considered the matter resolved in December 1998, after she mailed the settlement check, explains

why Respondent's subsequent letters were not found therein.

¶ 57 Respondent testified that he drafted a petition, two cover sheets and a summons in October 2000. Respondent's law firm insisted that Myers sign a new contract with the firm's name on it, as a party. The original contract between Respondent and Myers apparently was misplaced during Respondent's move to the new firm due to circumstances beyond his control, involving file clerks and the mishaps that can occur during such times. Respondent e-mailed this new contract to Myers on November 20, 2000. Approximately one week later, Myers requested his file.

¶ 58 Respondent's assertions and testimony regarding the authenticity of letters he sent to Myers and to Smith is corroborated by the testimony of Jim Rutherford, an employee of the Whitten, Nelson McGuire law firm, who obtained Myers' file from storage and copied it, upon Respondent's request. Rutherford testified that he saw these letters, at issue herein, inside the file as he copied its contents. He also testified Respondent would not have had the opportunity or the time to produce these letters in the short interval of time between Respondent's copy request and the time Rutherford copied its contents.

¶ 59 Accordingly, based on all the evidence before us, we cannot say that any, much less all, of the statements in Respondent's written response to the grievance were false or constituted intentional misrepresentations. We hold that the OBA failed to establish this assertion by clear and convincing evidence. Therefore, we also hold that Respondent's conduct set forth hereinabove did not violate Rules 8.1(a) and 8.4(c), ORPC, and Rule 5.2, RGDP, and thus does not constitute grounds for professional discipline. We hold that the OBA failed to establish by clear and convincing evidence the allegations contained in Count II of its Complaint.

## COUNT III

¶ 60 The parties stipulated to the following facts, with regard to Count III.

¶ 61 "On October 5, 1999, the Respondent's client trust account balance fell below $2500.00 and remained below that balance until the Respondent made a deposit on [October] 18, 1999.

¶ 62 "The Respondent's trust account was overdrawn from October 15 through October 19, 1999, and reflected a negative balance of $1423.79 preceding ·a deposit dated October 19, 1999.

¶ 63 The OBA contends that Respondent's conduct set forth in Count III violated Rule 1.15(a), ORPC, and Rule 1.4(b), RGDP, and constitutes grounds for·professional discipline.[7] When we evaluate the mishandling of funds, we have defined three levels of culpability, to-wit: 1) commingling; 2) simple conversion, which occurs when an attorney applies a client or third person's money to a purpose other than that for which it was entrusted; and 3) misappropriation, which involves theft by conversion or otherwise. *State ex. rel. Oklahoma Bar Ass'n. v. Par-*

---

7. *Oklahoma Rules of Professional Conduct (ORPC), codified at 5 O.S.2001, Ch. 1, App. 3–A:*
   **Rule 1.15(a)** *Safekeeping Property* provides:
   (a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the written consent of the client or third person. Other property shall be identified as such and appropriately safe-guarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
   *Rules Governing Disciplinary Proceedings (RGDP), codified at 5 O.S.2001, Ch. 1, App. 1–A:*

   **Rule 1.4(b)** *Money transactions* provides:
   \* \* \*
   (b) Where money or other property has been entrusted to any attorney for a specific purpose, he must apply it to that purpose. He may not avail himself of a counterclaim or set-off for fees against any money or other property of his client coming into his hands for such specific purpose, and a refusal to account for and deliver over such money or property upon demand shall be deemed a conversion. This does not apply to the retention of money or other property otherwise coming into the hands of a lawyer and upon which the lawyer has a valid lien for his services.

*sons,* 2002 OK 72, ¶ 12, 57 P.3d 865, 867, citing *State ex rel. Oklahoma Bar Ass'n. v. Taylor,* 2000 OK 35, 4 P.3d 1242.

¶ 64 Respondent admits that his client trust account balance fell below $2,500.00 on October 5, 1999, and remained below that balance until Respondent made a deposit on October 18, 1999. Respondent also admits that his trust account was overdrawn from October 15, 1999, through October 19, 1999, and reflected a negative balance of $1,423.79, preceding a deposit dated October 19, 1999. However, Respondent denies that his conduct constitutes grounds for professional discipline. While he agrees that he mishandled funds in his trust account, Respondent states he did not have the intent to convert funds to his own use. Indeed, the Trial Panel so found, and we agree that the record before us supports this conclusion. Respondent states that when he realized his account was overdrawn, he corrected it by placing personal funds in the account and maintaining the proper amount until the case concluded and a check was sent to Travelers. Respondent provided records from his client trust account to OBA investigator Yandell, to establish that the $800.00 he withdrew after depositing Travelers' settlement check constituted a fee owed to Respondent for a case resolved in November 1998. The record reflects no evidence that Respondent converted settlement funds or applied funds received for one purpose toward another. Again, the Trial Panel agreed, as do we. The OBA has not produced any evidence that would refute Respondent's testimony that the $800.00 he withdrew after depositing Travelers' settlement check constituted a fee owed to Respondent for a case resolved in November 1998. Absent that, there is no evidence that Respondent converted these funds, much less clear and convincing evidence.

¶ 65 We were presented with a similar issue of a lawyer allowing the level of a client trust account to fall below the amount held on behalf of clients in *State ex rel. Oklahoma Bar Ass'n. v. Dunlap,* 1994 OK 81, 880 P.2d 364. In *Dunlap,* we held that this act, without more, was one of the less egregious forms of mishandling of client funds, finding it warranted reprimand and admonishment.

On several occasions the balance of the respondent's trust account fell below the amount he was to have been holding in trust for a client. When the irregularities occurred, the respondent offered in mitigation the fact that he was experiencing marital problems which ultimately led to a divorce. He acknowledged responsibility for his acts of misconduct and implemented new accounting procedures.

¶ 66 As we stated in *Dunlap,* 1994 OK 81, ¶ 11, 880 P.2d 364, 366, "[A]lthough the recommendations of the Trial Panel are given great weight, this Court has authority to disregard any or all of the Trial Panel's findings where appropriate." We declined to follow the Panel's recommendation for discipline, therein. The Trial Panel's recommendation in *Dunlap,* based upon findings that the respondent therein improperly managed his attorney trust account, was a six month suspension from the practice of law and imposition of costs of the proceedings. In rejecting this recommendation, we stated:

"... a six month suspension would accomplish nothing in furtherance of our goals. While we cannot excuse Respondent's behaviors, we find that he is unlikely to repeat his offenses. Suspension is unnecessary to protect the public or the integrity of the courts. Respondent's behaviors are less egregious than those of attorneys who have been suspended for six months. We therefore reprimand [Respondent] and admonish him that improprieties in clients' financial matters will not be condoned. We order that Respondent bear the costs of this proceeding in the amount of $319.40."

*State ex rel. Oklahoma Bar Ass'n. v. Dunlap,* 1994 OK 81, ¶ 25, 880 P.2d 364, 368.

¶ 67 Similarly, in *State ex rel. Oklahoma Bar Ass'n. v. Johnston,* 1993 OK 91, 863 P.2d 1136, one of the allegations against the respondent was mishandling of funds. In *Johnston,* the parties agreed that the respondent did not intend to misappropriate his clients' money. The Professional Responsibility Tribunal also agreed, concluding his misconduct stemmed from his ignorance of proper procedures for holding and distributing monies entrusted to him. *Johnston,* 1993

OK 91, ¶ 26, 863 P.2d 1136, 1144. However, the respondent in *Johnston* also violated other Rules, involving additional misconduct not relevant to our instant discussion. In *Johnston*, we suspended the respondent from the practice of law for four months and ordered that he pay costs in full, prior to reinstatement.

## AVAILABLE MITIGATION

¶ 68 Respondent offers the following evidence for purposes of mitigation. Respondent never has been disciplined by the Oklahoma Supreme Court, the California Supreme Court, or the Professional Responsibility Tribunal, during his 26 years of practice. Respondent never has been the subject of a grievance referred by the office of General Counsel for investigation. Witnesses spoke highly of Respondent at the hearing on this matter, before the Professional Responsibility Tribunal. In addition, Respondent served his country in the military. Finally, no one suffered financially as a consequence of Respondent's conduct.

¶ 69 We may consider mitigating circumstances in evaluating Respondent's conduct, and in assessing the appropriate discipline. *State ex rel. Oklahoma Bar Ass'n v. Taylor*, 2000 OK 35, 4 P.3d 1242, 1255. In mitigation of Respondent's mishandling of his trust account in October 1999, he offers extenuating family circumstances, including three deaths and several hospitalizations of close family members. Respondent sought medical assistance in August 1999 as a result, and was placed on medication for depression. In addition, Respondent offers that he has implemented a review of procedures for client trust funds and now utilizes a computer system, to insure accurate and timely information so that mishandling of his client trust account will not occur again. Further, we note that Respondent fully cooperated throughout the course of the investigation and prosecution of this matter. He also accepts full responsibility for his actions in allowing his client trust account to dip below the balance reflecting the amount of the Travelers' settlement check, and for allowing the account to become overdrawn. Indeed, he has taken steps to insure this never happens again. There is no indication that Myers was harmed by Respondent's representation, and no allegation to that effect.

¶ 70 Accordingly, we hold that Respondent mismanaged the funds in his client trust account when he allowed the balance to dip below that necessary to safeguard the $2,500.00 settlement check, and again when he allowed his client trust account to become overdrawn. He stipulated to these facts, and these facts prove by clear and convincing evidence that Respondent mismanaged the funds. However, we also hold that Respondent had no intent to commingle, convert or misappropriate funds from his client trust account. His mismanagement resulted from his ignorance as to how to handle the funds, which he has corrected as evidenced in his implementation of a review of procedures for client trust funds and his utilization of a computer system, to insure accurate and timely information so that mishandling of his client trust account will not occur again.

¶ 71 When we impose discipline, our purpose is to inquire into the attorney's continued fitness to practice law with a view to safeguarding the public, the courts and the profession, not to punish the involved attorney. *State ex rel. Oklahoma Bar Ass'n. v. Mayes*, 1999 OK 9, ¶ 23, 977 P.2d 1073, 1082. We reject the Trial Panel's disciplinary recommendation. That recommendation was based in part on violations which were not established, as we have held herein. Additionally, several factors mitigate any discipline we may impose.

¶ 72 In the case at bar, a one year suspension, with thirty days actually served, would accomplish nothing in furtherance of our goals. While we cannot excuse Respondent's behavior concerning his client trust account management during 1999, we find that he is unlikely to repeat his offenses. Suspension is unnecessary to protect the public or the integrity of the courts. We note that the record contains testimony by three individuals who attested to Respondent's reputation, abilities and integrity, and who shared positive observations of Respondent in his work environment. Respondent's behaviors are less egregious than those of attorneys who

have been suspended for three months. Accordingly, we publicly reprimand Respondent and admonish him that improprieties in clients' financial matters will not be condoned.

## APPLICATION TO ASSESS COSTS

¶ 73 Since this case hinges on the veracity of Respondent versus that of his client, Myers, whose case gave rise to the complaint filed by Myers subsequent attorney, we find it probative that Myers and his father, Jack Myers, submitted some claims for reimbursement to Complainant that were, at best, inappropriate, and at worst, fraudulent. While we decline to examine where, on that line, these claims fall, we do take into consideration their very existence, for purposes of ascertaining the veracity of Jeff Myers, upon which the majority of Complainant's case against Respondent rests. For example, the investigation expense sought by the OBA, submitted by Myers' father, Jack Myers, a witness in the case, supported by an unsigned claim that fails to give any information as to what appropriate cost or expense might be reimbursable, was inappropriate. Nor was Mr. Myer's claim for $200.72 in lost wages, referenced by the OBA as a "miscellaneous investigation expense" appropriate.

¶ 74 In addition, the OBA submitted duplicate mileage claims for Jack and Jeff Myers, because the two submitted those claims to the OBA, and the OBA and both Myers knew they traveled in the same vehicle to the October 13, 2003, hearing. Similarly, Jack and Jeff Myers submitted duplicate meal claims for their own meals and for additional people, as evidenced by the receipts indicating meals for more than two people, which the OBA originally claimed as costs against Respondent.

¶ 75 Jeff Myers also submitted a receipt for reimbursement from the Cracker Barrel evidencing a meal with three guests, another claim clearly inappropriate, at best. He also submitted a claim for a rental car, for one day, but the 945 miles and 3 1/2 days on the receipt are far and above the reimbursable costs, if any, for a car rental to get to and from the Tulsa airport to the hearing on October 13, 2003. Indeed, Myers arrived in

Tulsa at 10:51 p.m. on October 9, 2003, rented this vehicle October 10, 2003 at 11:12 a.m. and returned it at 6:28 p.m. on October 13, 2003. After Respondent protested this inappropriate "costs" in this matter, the OBA amended its Application to Assess Costs, to delete these. These actions of Jeff and Jack Myers further call into question their credibility.

¶ 76 Since their capacity to be honest is central to the OBA's complaint against Respondent, we find these "costs" to be problematic, vis-a-vis the Myers' capacity to be truthful witnesses against Respondent. The above-referenced improprieties, the discernible inconsistencies in Myers' testimony, and unexplained and stark inconsistencies in his physical condition, taken together, create an air of suspicion as to his veracity, that the evidence before us fails to dispel. Shortly after the accident in 1998, the military declared Myers fit for duty. His discharge physical of December, 1999, reflects no complaints of pain, no medications, no continuing injuries, and deems Myers medically fit for discharge and reenlistment, with the highest rating, RE 1–A. Strangely, in March 2000, a Dr. David Traub found Myers to have back problems.

¶ 77 According to Dr. Traub's notes from the physical examination, Myers had stated he had been "broad-sided," an event that did not occur in the rear-end accident in December 1998. Dr. Traub scheduled physical therapy and placed Myers on pain medication. On August 24, 2000, Myers had a CT scan that indicated a slightly bulging disc in the lumbar-sacral area, a condition that the evidence indicates did not exist in December 1998. Respondent apparently recognized the potential problems that might arise as a result of these inconsistencies in physical condition, and informed Myers of them. He also reminded Myers, as a former military man himself, that he was obligated to inform the military if he received a larger settlement, and that the military would expect reimbursement for the medical expenses it paid on his behalf, if Myers settled for a significant amount in excess of the original $2,500.00 settlement. Respondent submits that this was the actual reason Myers hired

another attorney. Neither Myers nor the OBA addresses this contention.

■ ¶ 78 Pursuant to Rule 6.16, Rules Governing Disciplinary Proceedings (RGDP), 5 O.S.2001, Ch. 1, App. 1–A,[8] the cost of the OBA's investigation and the instant disciplinary proceedings shall be surcharged against Respondent, unless remitted in whole or in part by the Supreme Court for good cause shown. As we observed in *State ex rel. Oklahoma Bar Ass'n. v. Israel*, 2001 OK 42, 25 P.3d 909, the fact that an attorney prevailed on two of three counts in a disciplinary case constituted good cause to reduce the costs to be paid by him, to one third of the amount requested. In *Israel*, we thus reduced the costs to one-third of the sum originally requested, to-wit: from $2,370.36 to $790.12. *Israel*, 2001 OK 42, ¶ 32, 25 P.3d 909, 916. In the case at bar, where Respondent has prevailed on two of the three counts, we hold that good cause exists for reducing the costs sought by the OBA, to one-third of the $3,481.93 requested in its Amended Application. Accordingly, costs to be assessed against Respondent are therefore reduced to $1,160.64, to be paid within ninety days of the effective date of this opinion.

RESPONDENT PUBLICLY REPRIMANDED AND ASSESSED COSTS OF PROCEEDINGS.

All Justices Concur.

---

8. *Rules Governing Disciplinary Proceedings (RGDP), 5 O.S.2001, Ch. 1, App. 1–A*
**Rule 6.16** *Cost of investigations and disciplinary proceedings where discipline results* provides:
The costs of investigation, the record, and disciplinary proceedings shall be advanced by the Oklahoma Bar Association (or the Professional Responsibility Commission, if provision therefore has been made in its budget). Where discipline results, the cost of the investigation, the record, and disciplinary proceedings shall be surcharged against the disciplined lawyer unless remitted in whole or in part by the Supreme Court for good cause shown. Failure of the disciplined lawyer to pay such costs within ninety (90) days after the Supreme Court's order becomes effective shall result in automatic suspension from the practice of law until further order of the Court.